KORMAN, District Judge,
concurring in part and dissenting in part:
Today, the majority allows three class actions on behalf of all persons who lived in South Africa between 1948 and the present and who suffered damages as a result of apartheid to go forward in a United States court against American, Canadian, and European corporations that sold goods and materials or made loans to the Union of South Africa during the apartheid era. It does so over the vigorous objections of the United States, its allies, and, most notably, the Republic of South Africa, which is justifiably proud of the ability of its legal system to adjudicate legitimate human rights claims. In doing so, the majority also ignores a direct signal from the Supreme Court of the United States regarding the non-viability of these claims. The majority also declines to dismiss the case, even though the legal foundation of the complaints was expressly rejected by a judgment rendered in Nuremberg that “[ljoans or sale of commodities to be used in an unlawful enterprise may well be condemned from a moral standpoint and reflect no credit on the part of the lender or seller in either case, but the transaction can hardly be said to be a crime.” United States v. von Weizsaecker (“The Ministries Case”), 14 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10 308, 622 (William S. Hein & Co., Inc. 1997) (1949). Indeed, the defendant in that case was an officer of the Dresdner Bank, which is a named defendant in this case. The theory of liability was that the Dres-dner Bank provided loans to businesses knowing that the funds would be used to finance enterprises that employed slave labor. In acquitting the corporate officer of the charges relating to slave labor, the tribunal at Nuremberg observed that:
The real question is, is it a crime to make a loan, knowing or having good reason to believe that the borrower will us[e] the funds in financing enterprises which are employed in using labor in violation of either national or international law? ... A bank sells money or credit in the same manner as the merchandiser of any other commodity. It does not become a partner in enterprise *293 and the interest charged is merely the gross profit which the bank realizes from the transaction, out of which it must deduct its business costs, and from which it hopes to realize a net profit. Loans or sale of commodities to be used in an unlawful enterprise may well be condemned from a moral standpoint and reflect no credit on the part of the lender or seller in either case, but the transaction can hardly be said to be a crime. Our duty is to try and punish those guilty of violating international law, and we are not prepared to state that such loans constitute a violation of that law
Id. The theory of liability rejected by the tribunal is the same as that alleged here against Dresdner Bank. A00211-12. Specifically, along with other banks, it is accused of providing “[f]oreign capital in the form of trade loans, large international bonds and credits, direct loans ... to South African borrowers, and project financing [that] supported the apartheid regime.” A00194.
Instead of deferring to the reasoned judgment rendered at Nuremberg, one member of the majority, Judge Hall, eschews any reference to sources of customary international law and applies a principle of aiding-and-abetting in civil cases that the Supreme Court observed “has been at best uncertain in application ... with the common-law precedents ‘largely confined to isolated acts of adolescents in rural society.’ ” Cent. Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 181, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (quoting Halberstam v. Welch, 705 F.2d 472, 489 (D.C.Cir.1983)). The second member of the majority, Judge Katzmann, concludes that a defendant’s liability for aiding-and-abetting a crime against humanity must be determined by reference to customary international law, and he then goes on to articulate the standard for determining such liability. While the standard he enunciates is consistent with the holding in the Ministries Case, and also reflects an emerging consensus on the appropriate standard for holding a private party liable for aiding-and-abetting, he joins Judge Hall in voting to vacate the judgment dismissing the case without deciding whether the allegations in the complaints are sufficient to satisfy that standard, and without addressing the objections of the United States and the Republic of South Africa to the exercise of jurisdiction over the complaints.
Background
Because the allegations in the complaint go unmentioned in the per curiam and concurring opinions, it is necessary to provide an overview of the case beyond describing the procedure by which the case made its way here. Judge Sprizzo’s opinion in the district court contains a detailed and accurate description of the hundreds of pages of allegations contained in the three voluminous complaints. See In re South African Apartheid Litig., 346 F.Supp.2d 538, 543-46 (S.D.N.Y.2004). This enables me to provide the following brief background.
In 1948, the National Party came to power in South Africa. From then until the early 1990s, that ruling party imposed and enforced a set of laws under which the non-white population was the subject of disenfranchisement, state-sponsored discrimination, and repression. These laws, establishing what became known as apartheid, included severe curtailments on the liberty of nonwhites with respect to residency, travel, assembly, education, employment, and marriage. Apartheid’s restrictions were enforced by members of South Africa’s military and police, and the history of apartheid includes many instances of arbitrary detention, torture, and killings by those state actors. The complaints re *294 count many of those instances of wrongful conduct by apartheid government officials, including the Sharpeville Massacre of 1960, the Soweto Massacre of 1976, and the killing of the Craddock Four in 1985.
The allegations are very different with respect to the defendants. The portions of the complaints relating to defendants’ alleged conduct focus principally on their trade with South Africa. Thus, car companies are accused of selling cars, computer companies are accused of selling computers, banks are accused of lending money, oil companies are accused of selling oil, and pharmaceutical companies are accused of selling drugs. The theory of the complaints is that in this way defendants facilitated or “aided-and-abetted” apartheid and its associated human rights violations. To support that theory, the complaints allege generally that defendants knew of the racist policies of apartheid; that they nevertheless so engaged in the transactions in and with the Union of South Africa; and that, had they not done so, the apartheid regime would have collapsed, apartheid would have ended sooner, and plaintiffs would not have suffered some or all of them injuries. The causal theory advanced by the Khulumani plaintiffs is even weaker: “Apartheid would not have occurred in the same way without the participation of defendants.” A00166 (emphasis added). Typical of the allegations are:
• “Apartheid needed the cooperation, financing and supplies from the defendant financial institutions and companies and/or their predecessors or successors to ensure that they had the technology, equipment, systems, infrastructures and weaponry to insure that their system could function.” A00304.
• “Without oil, the police and military could not have functioned and the economy of South Africa would have come to a standstill.” A00171.
• “More than any other single technological advancement, the computer fostered the concentration of administrative power in the hands of Africa’s white elite.” A00427.
• “Many computer uses were crucial for the apartheid regimes’ [sic] keeping track of political activists who were later targeted for assassinations.” A00430.
• “[A]ny transfer of capital to South Africa had military implications: loans to the railways and harbors systems assisted in the mobilization of the armed forces; trade financing provided the computers and telecommunications equipment necessary to the efficient functioning of a modern army; financing for housing project perpetuated the segregated housing of apartheid.” A00201.
• “The money from defendant German banks directly benefitted and supported the apartheid reign of terror in South Africa.” A00440.
• “Limitations on the employment of non-whites in salaried, administrative jobs puts a premium on automating such tasks. In this sense, U.S. computer firms helped to solve the skilled white labor problem.” A00428; see also A00306-07.
• “Defendant vehicle manufacturers knowingly supplied vehicles, parts, and other equipment to the South African Police (SAP), South African Defense Force (SADF) and South African Army.... These vehicles were used to patrol African townships, homelands, and other areas and were used to suppress dissent.” A00216; see also A00312.
The complaints themselves seek relief on behalf of all persons who lived in South Africa between 1948 and the present who *295 suffered damages as a result of apartheid. Moreover, they seek to hold responsible each of the defendants, whom they characterize as aiders-and-abetters, liable for “all acts comprising the entire system of apartheid — a criminal enterprise.” A00255. Nevertheless, they fail to link the conduct of a specific defendant to an injury suffered by a particular plaintiff. On the contrary, the gravamen of the complaints is not that individuals should recover from particular defendants in tort, but that millions of people who “lived under the apartheid system”, A00095, should recover from all the defendants for having been “subject to ... the overwhelming injustices that characterized apartheid.” Id. In sum, these are reparations cases, seeking at least $400 billion in reparations, rather than torts cases for damages. They fail to allege a cognizable cause of action.
Moreover, the plaintiffs conceded at oral argument that they are not anxious to amend their complaints to link a particular plaintiff to injuries caused by a particular defendant. Tr. at 64. Indeed, the attorney for the Khulumani plaintiffs acknowledged that he would not necessarily be satisfied with such an amendment, but that he would “accept it because it would be a beginning.” Tr. at 80. Nevertheless, he confessed that “[wjhat’s at stake here is almost by definition of the crime an inability to make that exact trace or that degree of particularity.” Tr. 80-81. This concession alone establishes that the allegations in any amended complaints would be insufficient “to raise a reasonable expectation that discovery will reveal evidence” to support them. Bell Atlantic Corp. v. Twombly, — U.S. -, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Instead, these complaints would simply provide a vehicle to coerce a settlement. Nevertheless, the per curiam opinion reverses the order dismissing the complaints and orders Judge Sprizzo to rule again on plaintiffs’ motions for leave to replead, because plaintiffs have indicated “that, if given the opportunity, they would narrow the claims and clarify the allegations against the various defendants.” Per Curiam Op. ante at 262-63.
I dissent from the holding keeping these claims alive for the reasons alluded to earlier and because (1) the Supreme Court, in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), has instructed us that this is the very sort of case in which jurisdiction should not be exercised; (2) the State Department has filed a persuasive Statement of Interest in this matter urging dismissal because of the adverse effect the continued prosecution of these cases would have on the interests of the United States and our relations with other countries; and (3) the Republic of South Africa, a democratically elected government representative of all South Africans, including the victims of apartheid, has asserted the right to define and finalize issues related to reparations for apartheid-era offenses within its own legal framework — thus making this lawsuit an insult to the post-apartheid, black-majority government of a free people. These grounds, among others, reinforce the compelling policy argument that a decision to hear these cases would “reflect[ ] the worst sort of ‘judicial imperialism’ ... [and] send the message that the United States does not respect the ability of South African society to administer justice by implying that U.S. courts are better placed to judge the pace and degree of South Africa’s national reconciliation.” Elliot J. Schrage, Judging Corporate Accountability in the Global Economy, 42 Colum. J. Transnat’l L. 153,166 (2003).
Discussion
1. Deference to the United States and the Republic of South Africa
This appeal is unique. Departing from its usual practice, the Supreme Court, in *296 the context of deciding a different case, has already given us guidance as to how this appeal should be decided. In Sosa, it held that, in determining whether the Alien Tort Claims Act (the “ATCA”) provides a basis for the exercise of jurisdiction over an alleged tort in violation of the law of nations, courts must apply “principle^] limiting the availability of relief’ beyond the requirement that the international law norm whose violation is alleged be sufficiently defined. 542 U.S. at 733 n.21, 124 S.Ct. 2739. Specifically, because the decision to permit a case to proceed involves “an element of judgment about the practical consequences of making that cause available to litigants,” id. at 732-33, 124 S.Ct. 2739, the Supreme Court suggested that “case-specific deference to the political branches,” id. at 733 n.21, 124 S.Ct. 2739, provided one limitation on the exercise of jurisdiction under the ATCA in certain instances.
Among the reasons for such deference is that the recognition of private rights of action for violations of international law may give rise to “collateral consequences.” Id. at 727, 124 S.Ct. 2739. Specifically, the Court cautioned that “the potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs.” Id. The Court continued: “Since many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution.” Id. at 727-28, 124 S.Ct. 2739. Then, focusing on the case before us on this appeal, the Supreme Court continued:
For example, there are now pending in Federal District Court several class actions seeking damages from various corporations alleged to have participated in, or abetted, the regime of apartheid that formerly controlled South Africa. See In re South African Apartheid Litigation, 238 F.Supp.2d 1379 (JPML 2002) (granting a motion to transfer the cases to the Southern District of New York). The Government of South Africa has said that these cases interfere with the policy embodied by its Truth and Reconciliation Commission, which “deliberately avoided a ‘victors’ justice’ approach to the crimes of apartheid and chose instead one based on confession and absolution, informed by the principles of reconciliation, reconstruction, reparation and goodwill.” Declaration of Penuell Mpapa Maduna, Minister of Justice and Constitutional Development, Republic of South Africa, reprinted in App. to Brief for Government of Commonwealth of Australia et al. as Amici Curiae 7a, ¶ 3.2.1 (emphasis deleted). The United States has agreed. See Letter of William H. Taft IV, Legal Adviser, Dept. of State, to Shannen W. Coffin, Deputy Asst. Atty. Gen., Oct. 27, 2003, reprinted in id., at 2a. In such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch’s view of the case’s impact on foreign policy. Cf. Republic of Austria v. Altmann, 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (discussing the State Department’s use of statements of interest in cases involving the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 et seq.).
Id. at 733 n.21,124 S.Ct. 2739.
The Executive Branch’s view of the impact of these cases on foreign policy is set forth at some length in a letter to the district court, dated October 27, 2003, from the Legal Advisor of the Department of State. The letter advises “that continued adjudication of the above-referenced mat *297 ters risks potentially serious adverse consequences for significant interests of the United States.” A01090. After outlining the objections of the Republic of South Africa to the continued prosecution of these cases in the United States and noting the “extensive steps” it has taken “to promote reconciliation and redress for apartheid-era injustices,” the Legal Advis- or observed that the Republic of South Africa “is broadly representative of the victims of the apartheid regime” and “is uniquely charged with a popular mandate to deal with the legacy of apartheid.” Id. He then concluded his discussion of this aspect of the Executive Branch’s concern as follows:
Support for the South African government’s efforts in this area is a cornerstone of U.S. policy towards that country. For that reason, we are sensitive to the view of the South African government that adjudication of the cases will interfere with its policy goals, especially in the areas of reparations and foreign investment, and we can reasonably anticipate that adjudication of these cases will be an irritant in U.S.-South African relations. To the extent that adjudication impedes South Africa’s on-going efforts at reconciliation and equitable economic growth, this litigation will also be detrimental to U.S. foreign policy interests in promoting sustained economic growth in South Africa.

Id.

The State Department also voiced other concerns. For one thing, the Legal Advis- or wrote, “[v]arious other foreign governments, including those of the United Kingdom and Canada, have also approached us via diplomatic channels to express their profound concern that their banks, corporations and other entities have been named as defendants.” A01090-91. Because of those governments’ “strong belief that the issues raised in the litigation are most appropriately handled through South Africa’s domestic processes,” the State Department “anticipat[ed] possible, continuing tensions in our relations with these countries over the litigation.” A01091.
Moreover, the Legal Advisor expressed concern over the chilling effect that actions of this kind may have on future foreign investment in developing countries:
The United States relies, in significant part, on economic ties and investment to encourage and promote positive change in the domestic policies of developing countries on issues relevant to U.S. interests, such as respect for human rights and reduction of poverty. However, the prospect of costly litigation and potential liability in U.S. courts for operating in a country whose government implements oppressive policies will discourage the U.S. (and other foreign) corporations from investing in many areas of the developing world, where investment is most needed and can have the most forceful and positive impact on both economic and political conditions. To the extent that the apartheid litigation in U.S. courts deters such investment, it will compromise a valuable foreign policy tool and adversely affect U.S. economic interests as well as economic development in poor countries.

Id.

In Whiteman v. Dorotheum GmbH & Co. KG, 431 F.3d 57 (2d Cir.2005) (Cabranes, J.), we recognized that “[jjudicial deference to the Executive Branch on questions of foreign policy has long been established under the prudential justicia-bility doctrine known as the ‘political question’ doctrine....” Id. at 69. In deciding what deference to accord the position of the Executive Branch, we referenced the foundational case of Baker v. Carr, which identified six independent tests for recog *298 nition of a political question. 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In Whiteman, we directed the dismissal of the complaint without examining each of the Baker tests because it was clear that the case met the fourth test, namely that “ ‘a court’s undertaking independent resolution’ of this claim is impossible ‘without expressing lack of the respect due’ the Executive Branch.” 431 F.3d at 72 (emphasis deleted) (citations omitted).
We need not examine any of the six independent tests identified in Baker because Sosa plainly held that the determination of whether to exercise jurisdiction over a cause of action for a violation of the law of nations is subject to “case-specific deference to the political branches.” 542 U.S. at 733 n.21, 124 S.Ct. 2739. More than that, the Supreme Court advised us that in the instant cases “there is a strong argument that federal courts should give serious weight to the Executive Branch’s view of the case’s impact on foreign policy.” Id. Indeed, one commentator, who has emphasized the need for a “searching review” of the Bush administration’s positions in human rights cases, has acknowledged that the present cases are different:
[These] cases reflect the unique history of South Africa and its transition from apartheid to democracy. The government that replaced the apartheid regime was recognized internationally as representative both of the majority of the nation and, in particular, of the victims of past human rights abuses. The transition included a negotiated process by which abuses would be investigated and perpetrators given the opportunity to testify about their actions in return for amnesty. When the democratically elected, representative government of South Africa objected to the impact of the U.S. litigation on the negotiated transition process, the executive branch asked the courts to defer to this judgment. All of these factors provide support for the Court’s suggestion that there is a “strong argument” that executive branch views “in such cases” are entitled to “serious weight.”
Beth Stephens, Sosa v. Alvarez-Machain, “The Door Is Still Ajar” for Human Rights Litigation in U.S. Courts, 70 Brook. L.Rev. 533, 562 (2005). (Professor Stephens and a fellow academic coauthored an amicus curiae brief on behalf of international human rights organizations and bar associations in support of the plaintiffs-appellants. While it urges reversal of the judgment of the district court, her amicus brief does not address the effect of footnote 21 in Sosa.)
In any event, the force of the advice of the State Department is enhanced by the fact that, under the doctrine of international comity, dismissal would be justified solely out of deference to the Republic of South Africa. Comity, a doctrine more easily invoked than defined, may be viewed as either “the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum,” Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 (D.C.Cir.1984), or as “a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state, the so-called comity among courts.” In re Maxwell Commc’n Corp., 93 F.3d 1036, 1047 (2d Cir.1996). A court’s exercise of discretion to dismiss a suit on comity grounds is independent of its treatment of the views of the Executive Branch. See Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227 (11th Cir.2004) (dismissing a claim on the grounds of international comity after declining to defer to the Executive Branch).
*299 The decision whether to dismiss on this basis depends on the degree to which the interests of a foreign sovereign are “legitimately affronted by the conduct of litigation in a United States forum,” Jota v. Texaco, Inc., 157 F.3d 153, 160 (2d Cir. 1998), steps the foreign sovereign may have taken to address the issues in the litigation, and the extent of our own interest in the underlying issues. See generally Bi v. Union Carbide Chems. & Plastics Co., 984 F.2d 582 (2d Cir.1993) (Newman, /.). Perhaps the most significant factor is whether the foreign sovereign to which we defer is a democratically elected government with an independent judiciary. Id. at 585-86.
In the present cases, the extent of the affront to the legitimate interests of the Republic of South Africa, the steps it has taken to address the issue of reparations, and the depth of feeling underlying its concern are amply reflected in the record. On April 15, 2003, in response to the Report of the Truth and Reconciliation Commission (“TRC”), the President of the Republic, Thabo Mbeki, announced the programs that would be implemented to assist the victims of apartheid:
[W]ith regard to specific cases of individual victims identified by [the] TRC Act, the government has put in place and will intensify programmes pertaining to medical benefits, educational assistance and provision of housing and so on. From time to time, Ministers have elaborated and will continue to expatiate on the implementation of these and other related programmes.
The TRC has reported that about 22,000 individuals or surviving families appeared before the Commission. Of these, about 19,000 required urgent reparations, and virtually all of them, where the necessary information was available, were attended to as proposed by the TRC with regard to interim reparations. With regard to final reparations, government will provide a once-off grant of R30,000 to those individuals or survivors designated by the TRC. This is over and above other material commitments that we have already mentioned.
We intend to process these payments as a matter of urgency, during the current financial year. Combined with community reparations, and assistance through opportunities and services we have referred to earlier, we hope that these disbursements will help acknowledge the suffering that these individuals experienced, and offer some relief.
A00745. President Mbeki then addressed the issue of “civil suits against corporations that benefitted from the apartheid system,” specifically this litigation. A00747. After reiterating “that the South African Government is not and will not be a party to such litigation,” he continued: “[W]e consider it completely unacceptable that matters that are central to the future of our country should be adjudicated in foreign courts which bear no responsibility for the well-being of our country and the observance of the perspective contained in our Constitution of the promotion of national reconciliation.” Id. While recognizing “the right of citizens to institute legal action,” President Mbeki also emphasized that the government’s approach is informed by “the desire to involve all South Africans, including corporate citizens, in a co-operative and voluntary partnership to reconstruct and develop South African society.” Id. Accordingly, he also rejected the once-off wealth tax on corporations suggested by the TRC. Id.
Likewise, in an address to Parliament on the same day, Alec Erwin, the Minister of Trade and Industry, emphasized that the government’s rationale for its rejection of *300 the once-off wealth tax applied equally to its opposition to the cases at issue:
It is for all the above reasons that we are opposed to and indeed contemptuous of attempts to use unsound extra-territorial legal precepts in the [United States of America] to seek personal financial gain in South Africa. Whilst individuals have an inviolate right to recourse in law and this is firmly entrenched in South Africa it is an abuse to use the law, unsound law at that, of another land to undermine our sovereign right to settle our past and build our future as we see fit. South Africans involved in this break that indefinable collectivist identity that was the origin of our strength. The government rejects the actions of legal practitioners in the USA to exploit our history and will not allow any judgment made in the USA or elsewhere to be carried out in South Africa.
A00754-55.
Professor Kader Asmal, the Minister of Education, also assailed the prosecution of these eases. He told the Parliament:
South Africa must settle this issue for themselves and does not need the help of ambulance chasers and contingency fee operators, whether in Switzerland, the Netherlands, or the United States of America. As South Africans, we have effectively dealt with our own historical challenges and we will continue to do so. It is part of our sovereign right.
A00758.
On April 16, 2003, the day after the addresses quoted above, the Cabinet of the Republic of South Africa resolved that “[i]t remains the right of the [Government [of South Africa] to define and finalise issues of reparations, both nationally and internationally.” A00803. Against this backdrop, the then-Minister of Justice, Penuell Mpa-pa Maduna, filed a declaration in the district court which set forth the Republic of South Africa’s view of various cases pending in the United States against corporations that did business with and in South Africa during the apartheid period, including the cases at issue here. The statement summarizes the actions undertaken by the Republic of South Africa “to repair the damage caused by the apartheid system through a broad programme of socioeconomic reparations which has at its heart, the betterment of the lives of the previously disadvantaged.” A00801. Then, addressing the prosecution of these cases, he argued that the remedies sought — including “the demand for billions of dollars in damages to be distributed by the U.S. courts” — are “inconsistent with South Africa’s approach to achieving its long term goals.” A00805. Specifically, he continued:
Permitting this litigation to go forward will, in the government’s view, discourage much-needed direct foreign investment in South Africa and thus delay the achievement of our central goals. Indeed, the litigation could have a destabil-ising effect on the South African economy as investment is not only a driver of growth, but also of employment. One of the structural features of the South African economy, and one of the terrible legacies of apartheid, is its high level of unemployment and its by-product, crime. Foreign direct investment is essential to address both these issues. If this litigation proceeds, far from promoting economic growth and employment and thus advantaging the previously disadvantaged, the litigation, by deterring foreign direct investment and undermining economic stability will do exactly the opposite of what it ostensibly sets out to do.
A00805-06. The last paragraph of Minister Maduna’s declaration invoked the doctrine of international comity. He observed
*301 that under United States law, courts may abstain from adjudicating cases in deference to the sovereign rights of foreign countries to legislate, adjudicate and otherwise resolve domestic issues without outside interference, particularly where the relevant government has expressed opposition to the actions proceeding in the United States, and where adjudication in the United States would interfere with the foreign sovereign’s efforts to address matters in which it has the predominant interest. The government submits that its interest in addressing its apartheid past presents just such a situation.
A00806.
Most recently, on this appeal, the Republic of South Africa filed an amicus curiae brief, which is not addressed in the per curiam and concurring opinions, arguing that these actions “fundamentally interfere with South Africa’s independence and sovereignty and intervene in its internal affairs, including its right under international law to address its apartheid past and to develop policies for its future in the manner it deems most appropriate, subject to the support and approval of the democratic electorate.” Br. for S. Afr. as Ami-cus Curiae at 1-2. Specifically, it emphasized that the continuation of this litigation would discourage business investment and, thereby, disrupt the growth of the South African economy. Id. at 3^4. In a statement appended to the brief, the current South African Minister of Justice, Brigitte Sylvia Mabandla, repeated verbatim the earlier statement of former Minister Ma-duna, adding that “another country’s courts should not determine how ongoing political processes in South Africa should be resolved.” Id. annex at 1.
In light of the consistent and considered policy of the Republic of South Africa and the programs it has put in place to provide reparations and assistance to the identifiable victims of apartheid, it is difficult to conceive of any policy reason for exercising jurisdiction over these cases. On the contrary, “[mjost judges would not want, by asserting their own jurisdiction in a doubtful case, to undermine efforts to rebuild national sovereignty, democratic institutions, and self-respecting courts, in countries that have lately suffered from catastrophic events that include international crimes.” Michael Kirby, Universal Jurisdiction and Judicial Reluctance: A New “Fourteen Points”, in Universal Jurisdiction: National Courts and the Prosecution of Serious Crimes Under International Law 240, 255 (Stephen Macedo, ed.2004). Indeed, Professor William R. Casto, whose scholarship was cited repeatedly by the Supreme Court in Sosa, has written that the apartheid regime in South Africa may be an example of a situation “in which a nation’s prior government has engaged in the most despicable misconduct, but the current government is making an honest, perhaps faltering, but nevertheless real effort to rectify the past misdeeds.... If apartheid were determined to be a violation of clearly established international law, a tort remedy for the victims of that evil system might nevertheless be inappropriate.” William R. Casto, The Nero Federal Common Law of Tort Remedies for Violations of International Law, 37 Rutgers L.J. 635, 656 (2006).
Particularly apposite here is the characteristically thoughtful opinion of Judge Newman in Bi v. Union Carbide Chemicals & Plastics Co., 984 F.2d 582. The case arose out of the devastating Bhopal industrial accident, in which deadly gas from a plant operated by Union Carbide India Ltd. (“UCIL”) blew into a densely populated part of India. Some 145 class actions were filed in federal district courts *302 across the United States and consolidated in the Southern District of New York. After the case was dismissed on the grounds of forum non conveniens, the Indian government, to which its parliament granted the exclusive authority to represent the victims of the disaster in India and elsewhere, filed suit in India on behalf of all claimants. India and Union Carbide ultimately agreed to a court-approved settlement, by which the latter agreed to pay $470 million to the Indian government for the benefit of all victims of the disaster.
After the settlement of the class actions in India, two cases were filed in Texas state courts on behalf of other victims 'of the Bhopal disaster. The cases were transferred to the Southern District of New York, where Judge Keenan dismissed both actions on the ground of forum non conveniens. We affirmed the dismissal, although on different grounds. Judge Newman described the appeal as presenting “an interesting issue of comity among nations in the resolution of claims arising from torts occurring within a foreign country.” Bi, 984 F.2d at 583. The precise issue he identified
is whether the federal and state courts of this country should defer to the judgment of a democratic foreign government that disputes arising from a mass tort occurring within its borders can be best resolved by according the foreign government exclusive standing to represent the victims of the disaster in the courts of the world.
Id. We declined to permit the plaintiffs to prosecute the class actions in federal or state court, notwithstanding their arguments that settlement of their claims by the Indian government was unfair and improper because, among other things,
the Indian Government had an unacceptable conflict of interest as part owner of UCIL, most of the victims oppose the settlement as grossly inadequate, and their due process rights were violated because they received inadequate notice and inadequate representation in the proceedings and because they could not opt out of the settlement.
Id. at 584.
After describing in detail the structure of the Indian government, pursuant to a Constitution that “provides for a republican form of parliamentary government and guarantees the fundamental rights of the people, including equal protection and procedural due process,” id. at 585, Judge Newman observed that India had chosen “to represent exclusively all the victims in a suit against Union Carbide and to use the money it received in settlement of that suit to fund a plan framed ... to process the claims of all the victims.” Id. at 586. Under these circumstances, he wrote, “[t]o grant the victims of the Bhopal disaster, most of whom are citizens of India, access to our courts where India has set up what it believes to be the most effective method of dealing with a difficult problem would frustrate India’s efforts.” Id. “[Wjere we to pass judgment on the validity of India’s response to a disaster that occurred within its borders,” Judge Newman continued, “it would disrupt our relations with that country and frustrate the efforts of the international community to develop methods to deal with problems of this magnitude in the future.” Id.
Moreover, it was not relevant whether “under our constitutional standards, our Government could pass an act similar to the Bhopal Act” pursuant to which the Indian government settled the claims that the plaintiffs sought to prosecute. Id. Instead, he wrote that:
when a recognized democracy determines that the interests of the victims of a mass tort that occurred within its borders will be best served if the foreign *303 government exclusively represents the victims in courts around the world, we will not pass judgment on that determination, and we will permit only the foreign government access to our courts to litigate those claims, subject of course to our own requirements for standing. This conclusion is especially compelling in a case such as this where almost all of the victims are Indian citizens.

Id.

The present cases involve a stronger basis for dismissal under the doctrine of international comity. Like India, the Republic of South Africa is a sovereign democratic state whose policies broadly reflect the interests of its people. Moreover, it has adopted policies and programs designed to address the effects of apartheid and compensate its victims. However, unlike the plaintiffs in Bi, whose claims were wiped out under Indian law and who had no alternative forum, the plaintiffs here may have a competent alternative forum in their home country that, by all accounts, is prepared to hear their grievances. Indeed, the plaintiffs have themselves acknowledged that relief would be available in the courts of the Republic of South Africa. See Khulumani Reply Br. at 27 (“No relief from civil or criminal liability was enacted for those who did not apply for and obtain amnesty from the TRC, ... South Africa’s approach leaves open the possibility for individual citizens to take up any grievance related to human rights violations with the courts (internal quotation marks omitted); Ntsebesa Reply Br. at 28 (“The acts alleged in plaintiffs’ complaints are illegal and would subject the defendants to suit in both the United States and South Africa.... ”).
Significantly, President Mbeki has stated, “[the] Government recognizes the right of citizens to institute legal action.” A00747. Likewise, in criticizing the prosecution of these cases in the United States, Minister Erwin noted that the plaintiffs “have an inviolate right to recourse in law” — just not in the United States. A00754. Thus, unlike the victims of the Bhopal disaster, there is every indication they may have their day in court, in their home country, before an independent judiciary, in a manner consistent with traditional notions of due process. As Minister Maduna stated in his declaration to the district court:
Under the Constitution, the judicial authority of the Republic is vested in the courts, which are independent and subject only to the Constitution and the law, which they must apply impartially and without fear, favour or prejudice. No person or organ of state may interfere with the functioning of the courts, while all other organs of the state, through legislative and other measures, must assist and protect the courts to ensure their independence, impartiality, dignity, accessibility and effectiveness. An order or decision of a court binds all persons to whom and organs of state to which it applies. South Africa has a well developed judicial system, with the Constitutional Court at its apex and the Supreme Court of Appeal as the final court of appeal in non-constitutional matters. Judgments of the Constitutional Court and, indeed, the Supreme Court of Appeal, are widely admired for their independence and incisiveness and are frequently referred to in judgments of other final courts of appeal internationally.
A00798-A00799. Similarly, as one scholar of South African law has observed,
[t]he new constitutional law not only introduced the ethos of a democratic Rechtsstaat, but also enacted an extensive array of socioeconomic rights that are designed to change South African *304 society fundamentally. These can be and indeed already have been used to secure, through litigation, the interests of the traditionally marginalised groups and to ensure their place on the political agenda.
Frangois du Bois, Introduction: History, System and Sources, in Introduction to the Law of South Africa 1, 3-4 (C.G. van der Merwe & Jacques E. du Plessis eds., 2004).
While I have assumed the availability of a forum in the Republic of South Africa, Bi makes clear that such an alternative forum is not always required before the doctrine of comity may be invoked. See also Jota, 157 F.3d at 160 (“[CJases might be imagined where a foreign sovereign’s interests were so legitimately affronted by the conduct of litigation in a United States forum that dismissal is warranted without regard to the defendant’s amenability to suit in an adequate foreign forum....”). Nevertheless, even if the availability of an alternative forum were an absolute prerequisite to dismissal on the ground of international comity, and one were not available in these cases, deference to South African law would be justified under a traditional choice-of-law analysis. Indeed, although he did not in haec verba invoke such analysis, Judge Newman’s opinion in Bi is entirely consistent with it.
We have previously held that the assumption of subject matter jurisdiction over a cause of action under the ATCA does not preclude a choice-of-law analysis resulting in dismissal of the ease. Filartiga v. Pena-Irala, 630 F.2d 876, 889 (2d Cir.1980). This inquiry is separate from the jurisdictional analysis. Indeed, we have read Filartiga as “requiring the district court to perform a traditional choice-of-law analysis to determine whether international law, [the] law of forum state, or [the] law of state where events occurred should provide substantive law in such an action.” Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 105 n. 12 (2d Cir.2000).
I engage in a hypothetical choice-of-law analysis here, because it focuses on the governmental interests of South Africa and the United States and serves to reinforce the argument against exercising jurisdiction over these cases. As we have observed,
[t]he federal common law choice-of-law rule is to apply the law of the jurisdiction having the greatest interest in the litigation.... The goal of this analysis is to evaluate the various contacts each jurisdiction has with the controversy, and determine which jurisdiction’s laws and policies are implicated to the greatest extent.
In re Koreag, Controle et Revision S.A., 961 F.2d 341, 350 (2d Cir.1992). In this case, the Republic of South Africa has the greatest interest, if not the only interest, in the application of its laws. The conduct alleged took place in South Africa and the victims were its own citizens. The remedies that its citizens should have as a result of the injuries they suffered at the hands of the apartheid regime are matters exclusively for its democratically elected post-apartheid government.
Moreover, the tenuous interest of the United States in the issues raised by these cases is also reflected in the fact that, under customary international law, we could not exercise subject matter jurisdiction over a cause of action against the primary tortfeasor — the officials of the Union of South Africa — or the foreign corporate defendants. This is so, because apartheid, however abhorrent it may have been, has not been regarded as an offense subject to the exercise of universal jurisdiction. This concept, as its name implies, “recognize[s] that international law permits any state to apply its laws to punish *305 certain offenses although the state has no links of territory with the offense, or of nationality with the offender (or even the victim).” Restatement (Third) of Foreign Relations Law § 404 cmt. a (1987); see also Matter of Extradition of Demjanjuk, 612 F.Supp. 544, 555-58 (N.D.Ohio 1985). Universal jurisdiction is dependent not only on “substantive agreement as to certain universally condemned behavior,” which transforms the behavior into a violation of customary international law, but also “procedural agreement that universal jurisdiction exists to prosecute a subset of that behavior.” Sosa, 542 U.S. at 762, 124 S.Ct. 2739 (Breyer, J., concurring in part and concurring in the judgment).
There is no agreement with respect to the latter issue. Although the Restatement (Third) of Foreign Relations Law cites racial discrimination, “when [] practiced systematically as a matter of state policy, e.g., apartheid,” as a violation of customary international law, id. § 702 cmt. i (emphasis deleted), it omits apartheid from the list of offenses subject to universal jurisdiction. Instead, the Restatement states that universal jurisdiction exists only for “certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism.” Id. § 404. Indeed, while the Reporters of the Restatement observed that the International Convention on the Suppression and Punishment of the Crime of Apartheid, adopted Nov. 30, 1973, 1015 U.N.T.S. 243 (the “Apartheid Convention”), provided for universal jurisdiction, they stated that it did so only “[ajmong [the] parties to the Convention.” Restatement (Third) of Foreign Relations Law § 702 reporters’ note 7. See also Antonio Cassese, Crimes Against Humanity, in 1 The Rome Statute of the International Criminal Court: A Commentary 353, 376 (Antonio Cassese et al., eds., 2002) (observing that the Rome Statute, enacted in 1998, is broader than customary international law and “expands general international law” insofar as it, inter alia, “broadens the classes of conduct amounting to crimes against humanity” to include “the crime of apartheid”).[1] Likewise, the European Commission, the executive body of the European Union, has stated explicitly that, while “apartheid[] is widely condemned by states ... at least at present, it does not give rise to universal jurisdiction because, among other reasons, the [Apartheid Convention] ... has not been widely ratified.” Br. for the European Commission as Amicus Curiae Supporting Neither Party, Sosa v. Alvarez-Machain, 542 U.S. 692 (No. 03-339), 2004 WL 177036, at * 16 n.35. Another reason is that jurisdiction is limited to certain universally condemned crimes which “by their nature occur either outside of a State or where there is no State capable of punishing, or competent to punish, the crime (as in a time of war).” United States v. Yousef, 327 F.3d 56, 105 (2d Cir.2003). Of course, with respect to the conduct alleged here, there is now a *306 State capable of providing redress in a competent manner.
Under these circumstances, particularly the failure of the United States to sign or ratify the Apartheid Convention, denying a forum for these cases at this point cannot be said to undermine any interest of the United States. To the contrary, as the United States argues in its amicus brief, the prosecution of these cases harms significant interests of the United States. Obviously, the congressional interest in making available a forum under the ATCA would be undermined if we denied a forum where the regime, which violated the norm, was the same one that decided that such a cause of action should not be pursued. See Tachiona v. Mugabe, 234 F.Supp.2d 401, 415 (S.D.N.Y.2002) (declining deference to law of the foreign state in action alleging actionable conduct by a sitting government). But that is not the case here, for as the State Department has observed, the laws of the Republic of South Africa reflect policy judgments made by a government that “is broadly representative of the victims of the apartheid regime” and “uniquely charged with a popular mandate to deal with the legacy of apartheid.” A01090. We have no interest in undermining its law or policy.
In sum, to quote again from one learned commentary:
A court decision to hear an Alien Tort Statute claim over action in South Africa reflects the worst sort of “judicial imperialism.” It would send the message that the United States does not respect the ability of South African society to administer justice by implying that U.S. courts are better placed to judge the pace and degree of South Africa’s national reconciliation. In contrast, U.S. intervention to block such a suit sends a different signal to South Africa and other countries struggling through difficult political transitions. It would communicate our recognition of the respected position that the justice system holds in South Africa and reinforce the importance of having those claims judged in that country.
Schrage, supra, at 166.[2]
The majority declines to address the aspect of Sosa directing courts to determine the deference owed to the Executive Branch’s view of the case, notwithstanding the facts that both parties and amici devote many pages of argument to this issue and that the issue goes directly to whether subject matter jurisdiction should be exercised over the cause of action alleged by the plaintiffs. The principal reason given for this silence is that “the district court explicitly refrained from addressing the defendants’ arguments that the ATCA claim presented a non-justiciable political question.” Per Curiam Op. ante at 262 (citing In re S. African Apartheid Litig., 346 F.Supp.2d at 543 n. 4) (parenthetical omitted). The footnote in Judge Sprizzo’s opinion, from which the per curiam opinion quotes an incomplete excerpt, reads as follows:
*307 Defendants also argue that there is no case or controversy for this Court to hear under Article III of the Constitution because plaintiffs cannot establish that they have standing to bring this action and because the matter is a non-justiciable political question. See Memorandum of Law in Support of Defendants’ Joint Motion to Dismiss at 3-4. Given the Court’s finding that defendants are entitled to relief on other grounds, the Court need not address these remaining grounds for defendants’ motion.
In re S. African Apartheid Litig., 346 F.Supp.2d at 543 n.4.
Contrary to the per curiam opinion, a careful reading of the record shows that Judge Sprizzo did not explicitly refrain from addressing the issue of the deference to be accorded to the position of the State Department under Sosa. Indeed, the Memorandum of Law in Support of the Defendants’ Joint Motion to Dismiss (“Joint Motion”), which Judge Sprizzo expressly referenced in the part of his opinion declining to address the argument that the ACTA claim presented a non-justicia-ble political question, argued (in relevant part) that the “adjudication of plaintiffs’ claim would require a court to pass on the merits of political questions that were resolved by the executive and legislative branches of the United States government in favor of commerce with South Africa.” Id. at 8. The defendants did not argue that the case should be dismissed in deference to the Statement of Interest filed by the United States, nor did they rely on the advice of the Supreme Court in Sosa that the views of the United States in this case “certainly deserve[d] great weight.” Sosa, 542 U.S. at 733 n.21, 124 S.Ct. 2739. Indeed, the defendants’ motion was filed before the Statement of Interest and a year before the Supreme Court suggested that it be afforded deference.
More significantly, a cursory reading of Judge Sprizzo’s opinion demonstrates that he did rely on the Supreme Court’s advice in Sosa. See In re S. African Apartheid Litig., 346 F.Supp.2d at 547, 551, 553-54. Nevertheless, I am unwilling to burden this opinion any further on this score because, even if Judge Sprizzo did not rely expressly on the Supreme Court’s guidance in Sosa as a basis for his holding, this would not be an excuse for avoiding the issue. While cases may be found where we declined to reach an issue not addressed by the district court, see, e.g., Bigio v. Coca-Cola Co., 239 F.3d 440 (2d Cir.2000), we have held expressly that we are “free to affirm a district court decision ... even [on] grounds not relied upon by the district court.” In re Methyl Tertiary Butyl Ether (“MTBE”) Prods. Liab. Litig., 488 F.3d 112, 134 (2d Cir.2007) (quoting Gmurzynska v. Hutton, 355 F.3d 206, 210 (2d Cir.2004)). Thus, in Bi, 984 F.2d 582, a mirror image of Bigio, the district court had dismissed a complaint on the grounds of forum non conveniens — a ground on which the defendant had not moved to dismiss, presumably because of the unavailability of another forum. See In re Union Carbide Corp. Gas Plant Disaster, MDL No. 626, 1992 WL 36135 (S.D.N.Y. Feb.18, 1992). We affirmed the dismissal, applying the principle of international comity, even though that issue had not been addressed by the district court. Bi, 984 F.2d at 586. Similarly, in Kadic v. Karadzic, 70 F.3d 232 (2d Cir.1995) (Newman, J.), the district court dismissed the two related cases before it solely on the ground of lack of subject matter jurisdiction under the ATCA. See Doe v. Karadzic, 866 F.Supp. 734, 736 (S.D.N.Y.1994). On appeal, however, the parties briefed three different grounds for dismissal, even though two of them had not been addressed by the district court, and *308 Judge Newman considered each of them in turn. Kadic, 70 F.3d at 238.
There is a good reason to reach the issue here. Prosecution of these cases undermines significant interests of the United States and our relations with the Republic of South Africa, as well as allies of the United States, who have expressed concern over the exercise of jurisdiction over these cases. Under these circumstances, it is an issue that should be resolved at the threshold. Particularly apposite here are the words of the Court of Appeals for the Seventh Circuit addressing a motion to dismiss a Sherman Act claim on the ground that the conduct alleged did not have a substantial effect on commerce within the United States. (The “effect on commerce” requirement was enacted as part of the Foreign Trade Antitrust Improvements Act of 1982 (“FTAIA”).) In holding that subject matter jurisdiction was implicated, the Seventh Circuit observed:
There are good policy reasons for [this conclusion]. The extraterritorial scope of our antitrust laws touches our relations with foreign governments, and so, it seems, it is prudent to tread softly in this area. If FTAIA sets out an issue on the merits, resolution of the issue could be delayed until late in the case, and the potential for a lawsuit to have an effect on foreign markets would exist while the ease remained pending.... Treating the matter as one of subject matter jurisdiction reduces the potential for offending the economic policies of other nations. In short, FTAIA limits the power of the United States courts (and private plaintiffs) from nosing about where they do not belong. And the power of the courts is precisely what subject matter jurisdiction is about.
United Phosphorus, Ltd. v. Angus Chem. Co., 322 F.3d 942, 952 (7th Cir.2003); see also In re BDC 56 LLC, 330 F.3d 111, 118 (2d Cir.2003) (finding that a particular issue was jurisdictional because it implicated “a threshold determination that should be made at the earliest possible stage of the proceedings”).
While I rely on these cases simply to demonstrate the force of the policy favoring the exercise of our discretion to decide this issue, they also support the argument that the issue here should be treated as one going to subject matter jurisdiction — which we must resolve — even if it would not necessarily be so treated in other contexts. This argument derives from the language of the ATCA and the Supreme Court’s analysis of the manner in which the threshold jurisdictional question should be resolved. Specifically, Sosa stated that “[a]ll Members of the Court agree that § 1350 is only jurisdictional” and “that the jurisdiction was originally understood to be available to enforce a small number of international norms that a federal court could properly recognize as within the common law enforceable without further statutory authority.” 542 U.S. at 729, 124 S.Ct. 2739.
The Supreme Court then observed that “it would be unreasonable to assume that the First Congress would have expected federal courts to lose all capacity to recognize enforceable international norms.... ” Id. at 730, 124 S.Ct. 2739. Sosa went on to discuss “the ultimate criteria for accepting a cause of action subject to jurisdiction under § 1350,” id. at 732, 124 S.Ct. 2739, while making it clear that the criteria it was setting forth were not exclusive. One consideration “involve[s] an element of judgment about the practical consequences of making that cause available to litigants in the federal courts.” Id. at 732-33, 124 S.Ct. 2739. Since subject matter jurisdiction under the ATCA depends on whether the defendants have violated an interna *309 tional law norm which federal courts are prepared to recognize, accept and make available to litigants, the application of the criteria for making that determination is one that by definition goes to the issue of subject matter jurisdiction.
Judge Katzmann argues that subject matter jurisdiction under the ATCA is established simply by virtue of an allegation that the defendant’s conduct violated a norm of international law and that the decision to provide a remedy for the alleged violation simply relates to the issue of “whether a cause of action exists.” Op. of Judge Katzmann ante at 266. The latter issue, this argument continues, does not implicate subject matter jurisdiction. Id. ante at 266-67. While this may be so with respect to 28 U.S.C. § 1331, which confers jurisdiction “of all civil actions arising under the Constitution, laws, or treaties of the United States,” the per curiam opinion ignores the language of the ATCA, which is one of a number of statutes in which “Congress has exercised its prerogative to restrict the subject-matter jurisdiction of federal district courts based on a wide variety of factors, some of them also relevant to the merits of a case.” Arbaugh v. Y & H Corp., 546 U.S. 500, 516 n.11, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006). Where Congress has done so, subject matter jurisdiction turns on whether the complaint states a cause of action. See id. at 515-16, 126 S.Ct. 1235 (“If the Legislature clearly states that a threshold limitation on a statute’s scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue.”).[3] Indeed, in Members For a Better Union v. Bevona, 152 F.3d 58 (2d Cir.1998), we vacated a judgment entered after trial for failure of the complaint to state a cause of action, id. at 61, without regard to the trial record and the assertion of the parties “that the district court had subject matter jurisdiction.” Id. at 67 n.1.[4]
More significantly, even before Sosa reaffirmed the jurisdiction-conferring nature of the ATCA, we “distinguish[ed][the] Alien Tort Claims Act, with its jurisdictional pleading requirement, from general federal question jurisdiction, which is ‘not defeated by the possibility that the aver-ments in the complaint may fail to state a cause of action.’ ” Bigio, 239 F.3d at 447 (citing Filartiga v. Pena-Irala, 630 F.2d 876, 887-88 (2d Cir.1980) (citing Bell v. Hood 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946))). Indeed, as early as the very “birth of the modern line of cases” construing the ATCA, Sosa, 542 U.S. at 724-25, 124 S.Ct. 2739, we acknowledged that, because of “the statute’s requirement of *310 alleging a ‘violation of the law of nations’ at the jurisdictional threshold[,][c]ourts have ... engaged in a more searching preliminary review of the merits than is required, for example, under the more flexible ‘arising under’ formulation.” Filartiga, 630 F.2d at 887-88 (comparing O’Reilly de Camara v. Brooke, 209 U.S. 45, 52, 28 S.Ct. 439, 52 L.Ed. 676 (1907) (question of ATCA jurisdiction disposed of “on the merits”) (Holmes, J.), with Bell, 327 U.S. 678, 66 S.Ct. 773 (general federal question jurisdiction not defeated by the possibility that the averments in the complaint may fail to state a cause of action)) (emphasis in original); accord Kadic, 70 F.3d at 238; Bigio, 239 F.3d at 447. After Sosa, “a more searching preliminary review of the merits” necessarily includes determining whether the plaintiffs have adequately pled a violation of the law of nations over which it is appropriate for the district court to exercise subject matter jurisdiction.
Again, even if I am wrong on this score, we should consider the issue of case-specific deference at this juncture because “the continued adjudication of the ... matters risks potentially serious adverse consequences for significant interests of the United States,”, A01090, threatens our relations with the Republic of South Africa, and poses “continuing tensions in our relations” with the other countries where many of the defendants are incorporated A01091. Just as the Seventh Circuit treated the FTAIA as a jurisdictional statute in order to avoid “offending the economic policies of other nations” during the pen-dency of the case, United Phosphorus, 322 F.3d at 952, we should do so here.
Moreover, the per curiam opinion offers no good reason for failing to do so. It suggests that its “approach is particularly appropriate here because plaintiffs have indicated that, if given the opportunity, they would narrow their claims and clarify the nature of their allegations against various defendants, changes that may affect how the district court ultimately decides to resolve these issues.” Per Curiam Op. ante at 263 (citing Tr. 7-8, 14-15). The Khulumani plaintiffs, however, did not seek leave to file an amended complaint and Judge Sprizzo has previously granted the Ntsebesa and Digwamaje plaintiffs leave to file a second amended complaint alleging that the defendants aided and abetted the violation of norms of customary international law.[5] Moreover, the per curiam opinion does not identify a single flaw in the current complaints that would need to be cured by an amended complaint, and the transcript of the oral argument does not reflect any offer by the plaintiffs to amend their complaints in any significant way. Indeed, the plaintiffs expressly argued against the standard that Judge Katzmann adopts in section II.B of his concurring opinion (which I have joined) for imposing liability on the defendants for aiding-and-abetting in violation of the norm of international law.
Nevertheless, relying on the amended complaints that the plaintiffs may be permitted to file, the per curiam opinion declines “to determine whether the plaintiffs have adequately pled a violation of international law sufficient to avail themselves of jurisdiction under the ATCA....” Per Curiam Op. ante at 260-61. The per curiam *311 opinion does so in the face of our holding in Bigio that the failure to properly plead a violation of the law of nations means that “neither [the district court] nor we may consider the matter further.... ” 239 F.3d at 447. Instead of upholding its obligation to determine whether subject matter jurisdiction exists, see In re MTBE, 488 F.3d at 121-22, the per curiam opinion offers up an advisory opinion that a plaintiff may allege that a private party aided and abetted a violation of a norm of customary international law without so much as a reference to the factual allegations in the complaint or citation to the specific norm.
Under these circumstances, it is difficult to understand the disposition of the appeal, a judgment that “vacate[s] the district court’s order denying plaintiffs’ motion for leave to amend.” Per Curiam Op. ante at 260. The majority does say that, “[i]n denying this motion, the district court relied, in part, on the erroneous premise that subject matter jurisdiction did not inhere and reasoned that any additional amendments to the pleadings would be futile.” Id. I pass over the incomplete and inaccurate description of the grounds for the denial of the motion to amend.[6] Nevertheless, I do not understand how the majority can say that Judge Sprizzo denied the motion to amend the complaint on the “erroneous premise” that subject matter jurisdiction was lacking, while declining to rule on the basic jurisdictional issue of whether the plaintiffs “have adequately pled a violation of international law sufficient to avail themselves of jurisdiction under the ATCA.” Id. at 261.
I decline to join in this peculiar disposition, by which my colleagues seek desperately to avoid the easiest ground on which to resolve this appeal — that of deference to the judgment of the Republic of South Africa, supported by our State Department, that these cases are none of our business — and go on to grapple unnecessarily with difficult issues relating to the ATCA and customary international law without being able to agree on the rationale for the result they reach. Nevertheless, since the majority has chosen to do so, I address the issue whether the scope of liability for violations of the international law norms at issue here extends to private actors, such as corporations, for aiding-and-abetting. I then turn to the separate opinions of Judges Hall and Katz-mann.
2. The Scope of Liability Under the ATCA
Sosa indicates that this inquiry requires consideration of two separate principles. First, the Court held that the ATCA should not be read to create jurisdiction over “violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1360 was enacted.” 542 U.S. at 732, 124 S.Ct. 2739. Second, the Court observed that “[a] related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual.” Id. at 732 n. 20, 124 S.Ct. 2739. To that end, immediately thereaf *312 ter, the Court contrasted two opinions, one finding no consensus that torture by a private actor violated international law, Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 791-95 (D.C.Cir.1984) (Edwards, /., concurring), another finding such a consensus that genocide by a private actor did violate international law, Kadic, 70 F.3d at 239-41. Justice Breyer, in a separate opinion, agreed with the Court that the international law norm invoked “must extend liability to the type of perpetrator (e.g., a private actor) the plaintiff seeks to sue.” Sosa, 542 U.S. at 760, 124 S.Ct. 2739 (Breyer, J., concurring in part and concurring in the judgment) (citing id. at 732 n. 20, 124 S.Ct. 2739).
As did the Supreme Court in Sosa, we have held that, “[i]n order to determine whether the offenses alleged by the [plaintiffs] in this litigation are violations of the law of nations that may be the subject of Alien Tort Act claims against a private individual, we must make a particularized examination of these offenses ....” Kadic, 70 F.3d at 241 (emphasis added). In that case, Judge Newman then proceeded to engage in such an exercise. Id. at 241-44 (discussing independently genocide, war crimes, and torture and summary execution). More recently, in Wiwa, we reiterated our holding in Kadic that “the ATCA reaches the conduct of private parties provided that their conduct is undertaken under the color of state authority or violates a norm of international law that is recognized as extending to the conduct of private parties.” 226 F.3d at 104.
These holdings are consistent with the position of the European Commission, which clearly influenced Justice Souter’s majority opinion and Justice Breyer’s concurrence in Sosa. Specifically, in its ami-cus brief in Sosa, the Commission urged the Supreme Court to hold, as it ultimately did, that in determining whether a non-state actor was complicit in a violation of customary international law by a state actor, courts should apply international, rather than domestic, legal standards. 2004 WL 177036, at *4. Significantly, and again consistent with our holding in Kadic, the Commission argued that only a subset of norms recognized as customary international law applies to non-state actors and “hence only that subset may form the basis of liability against such actors. For example, non-state actors may be liable for genocide, war crimes, and piracy, while torture, summary execution, and prolonged arbitrary detention do not violate the law of nations unless they are committed by state officials or under color of law.” Id. at *11 (citations omitted).
Consistent with this analysis, I first address whether the complaint here makes allegations against defendants sufficient to hold them liable as acting under the color of law. I next turn to whether, at the time the alleged crimes were committed, there was a well established and universally recognized international norm providing for liability of private parties who aid and abet apartheid. Finally, while officers and employees of a corporation may be held responsible for using the entity as the vehicle for the commission of crimes against humanity, I address the issue whether the entities themselves may be held responsible.
(a) Private Party Liability under Col- or of Law
Judge Sprizzo held that the allegations against the defendants were not sufficient to “elevate them to the status of state actors.... ” In re S. African Apartheid Litig., 346 F.Supp.2d at 548-49. This aspect of his decision is challenged in the briefing of only one group of appellants. The state action element derives from the principle that violations of international *313 human rights norms, including apartheid, are violations of customary international law only if practiced, encouraged, or condoned by the government of a state as a matter of state policy. Restatement (Third) of Foreign Relations Law § 702 & cmt. b (discussed in Sosa, 542 U.S. at 737, 124 S.Ct. 2739). See United States v. Josef Altstoetter (“The Justice Case ”), 3 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10 954, 982 (William S. Hein & Co., Inc. 1997) (1947) (Crimes against humanity committed against German nationals are subject to punishment “only where there is proof of conscious participation in systematic government organized or approved procedures.... ”).[7] Indeed, this explains why Sosa specifically held that, before jurisdiction is accepted over an ATCA cause of action against a private actor, it must be determined “whether international law extends the scope of liability for a violation of a given norm to ... a private actor.... ” 542 U.S. at 732 n. 20, 124 S.Ct. 2739. Cf. Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (linking the color-of-law element of 42 U.S.C. § 1983 to the underlying state-action requirement of the Fourteenth Amendment, and holding that both exclude from their reach “merely private conduct, no matter how discriminatory or wrongful”) (internal quotation marks and citation omitted).
We have held that case law construing 42 U.S.C. § 1983 is “a relevant guide to whether a defendant has engaged in official action for purposes of jurisdiction under the Alien Tort Act.” Kadic, 70 F.3d at 245. As Judge Newman observed, “[a] private individual acts under color of law within the meaning of section 1983 when he acts together with state officials or with significant state aid.” Id. (citing Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). Subsequently, the Supreme Court has cautioned that the language from Lugar, which Judge Newman paraphrased, “must not be torn from the context out of which it arose,” Sullivan, 526 U.S. at 58, 119 S.Ct. 977, namely, an ex parte application for a writ of attachment. This admonition is a useful reminder that the “under color of law” cases arise in varying contexts. Many, including cases on which plaintiffs rely, have been limited to their facts. Id. at 55-59, 119 S.Ct. 977.
Perhaps the largest single category of cases under color of law are those in which the primary offender or tortfeasor is a private party, and the issue turns on whether “seemingly private behavior ‘may be fairly treated as that of the state itself.’ ” Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (quoting Jackson v. Met. Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). Because the cases on this appeal do not fit in this category, I am reluctant to discuss them in detail. Nevertheless, because plaintiffs rely on general language from the cases “torn from the context out of which it arose,” Sullivan, 526 U.S. at 59, 119 S.Ct. 977, I borrow from Professor Schwartz’s treatise, first, one significant caveat, and second, his useful synthesis of the Supreme Court’s holdings in this area.
The caveat is that, in analyzing the large body of decisional law concerning state *314 action, “it is important to consider the era in which the decision was rendered.” 1 Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses § 5.12, at 5-85 (4th ed.2003). Professor Schwartz explains that the Warren Court took an expansive view of state action in its effort to combat racial discrimination in society, but that the subsequent Burger and Rehnquist Courts reversed this trend in order to shield private behavior from the reach of the Constitution. Id. § 5.12, at 5-85-5-86. This reversal was undertaken not by explicitly overturning any earlier state-action decisions, but through a series of decisions finding no state action despite heavy government involvement in private conduct. Id. § 5.12, at 5-86. The unmistakable messages sent by these decisions are that the concept of state action is to be given only limited berth, and that federal courts must assess the continued vitality of earlier state-action precedents in light of more recent decisional law. Id.[8]
Professor Schwartz then supplemented this perceptive analysis by stating the principles that have emerged as the Supreme Court has narrowed the scope of its state-action jurisprudence:
1.Mere state regulation of private conduct, even if extensive, is insufficient to support a finding of state action.
2. State authorization of private conduct does not make the private party a state actor; to find state action, the state must participate in, coerce, or significantly encourage the contested activity.
3. State assistance to a private party, even if substantial, will not support a finding of state action, whether that assistance is in the form of direct financial aid, tax exemptions, monopoly power, government mortgage insurance, or the grant of a license.
4. The mere importance of the function carried out by the private sector is an insufficient basis upon which to find state action; for state action to be found, the function must be historically, traditionally, and exclusively governmental.
Id. § 5.12, at 5-87-5-88 (footnotes omitted). Professor Schwartz continues,
[t]he Supreme Court in some cases has found no state action, even when all four of these government involvements coalesced in the same case. Thus, the Court has found on more than one occasion that an entity was not engaged in state action even though it was extensively regulated, obtained governmental approval, received substantial govern *315 mental assistance, and performed an important societal function.
Id. § 5.12, at 5-88 (citing San Francisco Arts & Athletics v. United States Olympic Comm., 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987); Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); Jackson v. Metro. Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).
In analyzing the subgroup of state-action cases of which the instant cases are representative — those where the primary offender or tortfeasor is a state actor, and the question is whether a private party who is alleged to be an accessory may be deemed a state actor — it is useful to discuss the facts of the leading Supreme Court cases because they illustrate the kind of showing that must be made before a private party may be deemed a state actor in this context. The case most directly on point is Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), in which a private party bribed a judge to issue an order enjoining the production of minerals from certain oil leases. In holding that the private actor was acting “under color of law,” the Supreme Court observed that “[pjrivate persons, jointly engaged with state officials in a challenged action, are acting ‘under color’ of law for purposes of § 1983 actions.” Id. at 24, 101 S.Ct. 183. Specifically, “the allegations were that an official act of the defendant judge was the product of a corrupt conspiracy involving bribery of the judge. Under these allegations, the private parties conspiring with the judge were acting under color of state law; and it is of no consequence in this respect that the judge himself is immune from damages liability.” Id. at 28, 101 S.Ct. 183. On the other hand, if the private actor had merely resorted to the courts and prevailed in the lawsuit, he would not have been acting under color of law.
United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), which arose out of one of the saddest episodes of the civil rights movement, provides another compelling example of this subgroup. Price involved the arrest and subsequent murder of three civil rights workers in Mississippi. The facts are described as follows in the opinion of the Court:
On June 21, 1964, Cecil Ray Price, the Deputy Sheriff of Neshoba County, Mississippi, detained Michael Henry Schwerner, James Earl Chaney and Andrew Goodman in the Neshoba County jail located in Philadelphia, Mississippi. He released them in the dark of that night. He then proceeded by automobile on Highway 19 to intercept his erstwhile wards. He removed the three men from their automobile, placed them in an official automobile of the Neshoba County Sheriff’s office, and transported them to a place on an unpaved road.
These acts, it is alleged, were part of a plan and conspiracy whereby the three men were intercepted by the 18 defendants, including Deputy Sheriff Price, Sheriff Rainey and Patrolman Willis of the Philadelphia, Mississippi, Police Department. The purpose and intent of the release from custody and the interception, according to the charge, were to “punish” the three men. The defendants, it is alleged, “did wilfully assault, shoot and kill” each of the three. And, the charge continues, the bodies of the three victims were transported by one of the defendants from the rendezvous on the unpaved road to the vicinity of the construction site of an earthen dam approximately five miles southwest of Philadelphia, Mississippi.
*316 Id. at 790, 86 S.Ct. 1152. The Supreme Court held that private individuals who participated directly with state actors pursuant to a common design were acting under color of law. “In effect, if the allegations are true, they were participants in official lawlessness, acting in willful concert with state officers and hence under color of law.” Id. at 795, 86 S.Ct. 1152. Pnce is a classic example of the rule that private parties act under color of law when they are “engaged in a conspiracy with state officials to violate the Fourteenth Amendment.” Conway v. Vill. of Mount Kisco, 750 F.2d 205, 214 n. 12 (2d Cir.1984) (Oakes, J.); accord Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 272-73 (2d Cir.1999); Alexis v. McDonald’s Rests. of Mass. Inc., 67 F.3d 341, 352 (1st Cir.1995); Mershon v. Beasley, 994 F.2d 449, 451 (8th Cir.1993); Annunziato v. The Gan, Inc., 744 F.2d 244, 251 (2d Cir.1984).
There is good reason to require direct participation with a state actor pursuant to a conspiracy or common design before holding a private party, who is not the primary wrongdoer, liable as a state actor. Where the issue is whether a public official can be held liable for the primary wrongdoing of a private actor, the public office he holds suffices to satisfy the state-actor requirement; the only issue is whether his conduct in that capacity constitutes a proximate cause of the plaintiffs injury. Thus, “a state actor may be subject to liability for an action physically undertaken by private actors in violation of the plaintiffs liberty or property rights if the state actor directed or aided and abetted the violation.” Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir.1993). On the other hand, where the primary actor is a public official, for a private actor to be deemed a state actor, he must jointly participate in the wrongful conduct, pursuant to a common design or plan. As the Supreme Court explained in Adickes v. S.H. Kress & Co., “[t]he involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner’s Fourteenth Amendment equal protection rights.... Moreover, a private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983.” 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).
This holding finds support in the law of agency. “When two persons engage jointly in a partnership for some criminal [or legitimate] objective, the law deems them agents for one another. Each is deemed to have authorized the acts and declarations of the other undertaken to carry out their joint objective.” United States v. Russo, 302 F.3d 37, 45 (2d Cir.2002). Thus, a private party who conspires with a state actor becomes Ms agent, and his actions in that capacity are sufficient to make him an actor under color of law. Similarly where a private party induces an otherwise innocent public official to commit an offense, he has effectively made that person his or her agent.
This doctrine is an outgrowth of common law principles of criminal responsibility dating at least as far back as Regina v. Saunders, 2 Plowd. 473 (1575); and of principles of civil responsibility established, by force of the maxim qui facit per alium facit per se [he who acts thorough another acts for himself], at least as early as the 14th century.
United States v. Lester, 363 F.2d 68, 72 (6th Cir.1966). On the other hand, there is no legal framework or precedent for holding that a private party, merely selling goods or materials to a state actor, is himself acting under color of law.
*317 Consistent with this precedent, we have held that a conspiracy to violate an international law norm is necessary to render a private party liable for conduct in which the state is the primary actor. Bigio, 239 F.3d at 447. Indeed, there we rejected a cause of action alleging that Coca-Cola Co. was acting “under color of law” where there was “no allegation in the complaint, let alone any hint of evidence ... that Coca-Cola had any role as a participant or co-conspirator in the confiscation of the Bigios’ property.” Id. at 449; cf. In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831, 841 (2d Cir.1992) (holding that joint participation pursuant to an agreement — express or implied — to commit a tort is necessary to impose liability on those acting in concert); Restatement (Second) of Torts § 876(a) (imposing liability on one who “does a tortious act in concert with the other or pursuant to a common design with him”).
Neither Judge Katzmann nor Judge Hall takes issue with my analysis of section 1983 cases defining circumstances under which a private party may be deemed to have acted under color of law. Judge Katzmann, however, relying on cases applying the general criminal aiding-and-abetting statute applicable to all federal crimes, 18 U.S.C. § 2, argues that a private person may be liable for aiding-and-abetting a public official in the commission of a crime even though he may be incapable of committing the crime himself and even though his conduct would not satisfy the standard set out in § 1983 for treating him as a state actor. Op. of Judge Katz-mann ante at 281 (citing In re Nofziger, 956 F.2d 287, 290 (D.C.Cir.1992); United States v. Tannenbaum, 934 F.2d 8, 14 (2d Cir.1991)). The fact that a person may be convicted of aiding-and-abetting an offense of which he could be found guilty as a principal — because Congress has so provided — does not provide a basis for imposing such liability in the present context. Because Congress has not enacted a comparable civil aiding-and-abetting statute, a private party could not be subject to such liability in a civil action under 42 U.S.C. § 1983. Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 181-82, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).
Significantly, when Congress enacted the Torture Victims Protection Act of 1991 (“TVPA”) to comply to with the Torture Convention, it provided for civil causes of action only against “[a]n individual who, under actual or apparent authority, or col- or of law, of any foreign nation,” undertakes conduct prohibited by the Act. TVPA § 2(a), Pub.L. No. 102-256, 106 Stat. 73 (1992). Moreover, the Senate Report accompanying the legislation provides that “[cjourts should look to principles of liability under U.S. civil rights laws, in particular section 1983 of title 42 of the United States Code, in construing ‘under color of law5 as well as interpretations of ‘actual or apparent authority’ derived from agency theory in order to give the fullest coverage possible.” S. Rep. 102-249, at 8 (Nov. 26, 1991). To the extent that the Senate Report speaks to the issue of aiding-and-abetting, it addresses the issue of supervisory liability and makes the point that “a higher [public] official need not have personally ordered the abuses in order to be held liable. Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts [to] anyone with higher authority who authorized, tolerated, or knowingly ignored those acts.” Id. at 9 (citing In re Yamashita, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946); Forti v. Suarez-Mason, 672 F.Supp. 1531 (N.D.Cal.1987)); see also Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995) (applying the same general prin *318 ciples to determine the liability of supervisory public officials under 42 U.S.C. § 1983).
Indeed, notwithstanding the division on the panel with respect to other issues, the per curiam opinion, reflecting the agreement of all members of the panel, holds that the allegations in the complaint are insufficient to render the defendants liable under the color of law for violation of the TVPA. Specifically, it rejects the cause of action under the TVPA, alleging that the defendants “aided and abetted the apartheid regime’s subjecting the Plaintiffs to torture and extra judicial killing within the meaning of the [TVPA] ... under actual or apparent authority, or under color of law.” A-00505. Applying principles of liability under section 1983, the per curiam opinion properly concludes that the complaint “failed to link any defendants to state aid or the conduct of state officials.” Per Curiam Op. ante at 259. The same is true with respect to the other causes of action.
Nevertheless, even if 18 U.S.C. § 2 applied in this context, the standard for imposing liability for aiding-and-abetting pursuant to this section is not satisfied by the complaints in this case. Specifically, the Supreme Court has held that, “[i]n order to aid and abet another to commit a crime it is necessary that a defendant in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.” Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949) (internal quotation marks and citation omitted). This element is also essential to a civil cause of action for aiding-and-abetting. See, e.g., E. Trading Co. v. Refco, 229 F.3d 617, 623 (7th Cir.2000) (Posner, J.) (observing “that one who aids and abets a fraud, in the sense of assisting the fraud and wanting it to succeed, is himself guilty of fraud”). Indeed, in United States v. Blankenship, Judge Easterbrook, after citing to the Model Penal Code for the proposition that a “supplier [is] culpable only if he has ‘the purpose of promoting or facilitating’ the crime,” observed that a similar approach has been adopted to aiding-and-abetting in civil cases. 970 F.2d 283, 286 (7th Cir.1992). Moreover, in Boim v. Quranic Literacy Institute, the same court held that 18 U.S.C. § 2339A, which created a civil cause of action for those injured by terrorist acts against individuals who provided support to terrorist groups, survived a First Amendment challenge “so long as the plaintiffs are able to prove that the defendants knew about the organization’s illegal activity, desired to help that activity succeed and engaged in some act of helping.” 291 F.3d 1000, 1028 (7th Cir.2002). Cf. Halberstam v. Welch, 705 F.2d 472, 488 (D.C.Cir.1983) (holding that “desire to make the venture succeed” is a factor in determining aiding-and-abetting liability).
There is no allegation here that the defendants acted with the intent to make the violation succeed. On the contrary, plaintiffs strenuously argued in their briefs and at oral argument that they were not required to make such a showing. Ntsebesa Reply Br. at 19; Khulumani Reply Br. at 11; Tr. at 13. They argue that a private party who knowingly facilitates the commission of an international law violation by a state actor acts under color of law. I use the term “facilitates” because “[o]ne who merely sells goods to a buyer is not an aider and abettor of crimes that the buyer might commit, even if the seller knows that the buyer is likely to use the goods unlawfully, because the seller does not share the specific intent to further the buyer’s venture.” Corrie v. Caterpillar, Inc., 403 F.Supp.2d 1019, 1027 (W.D.Wash.2005) (citing Blankenship, 970 F.2d at 285-87), aff'd on other grounds, Corrie v. Caterpillar, Inc., 503 F.3d 974 (9th Cir.2007); see also N.Y. Penal Code § 115.05 (criminal facilitation). Indeed, such conduct does not violate customary international law. See The Ministries Case, 14 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10 621-22.
*319 Nevertheless, plaintiffs suggest that the relevant inquiry is not whether the relationship between the State and the private actor is of a commercial nature, but rather — much like aiding-and-abetting under the substantial assistance prong of section 876 of the Restatement (Second) of Torts — whether the private actor had sufficient prior knowledge of the government’s plans to commit violations of international law and of the ways in which the goods or services procured by the government would aid in those illicit actions that the private actor can be said to have become party to the government’s actions. The issue, however, is not whether the private actor has become “a party to the government’s actions” — whatever that means. Instead, it is whether by engaging in this conduct he acted “under color of law.” Adickes, 398 U.S. at 150, 90 S.Ct. 1598; Ginsberg, 189 F.3d at 273. A holding that he does, in the circumstances described in the complaints, strains both the phrase and the concept to the breaking point.
(b) Aiding-and-abetting Liability of Private Parties
Ordinarily, the fact that the defendants’ conduct is not sufficient to hold them liable for acting under color of law would compel the dismissal of the causes of action alleging various crimes against humanity that were not committed during war or an armed conflict. See Kadic, 70 F.3d at 244. Nevertheless, Judge Sprizzo identified two potentially applicable international agreements that contemplated liability for private actors. The first and most obvious source of such liability is the Apartheid Convention, which was expressly drafted to cover all of the conduct of the Union of South Africa that the defendants allegedly aided and abetted. Of this Convention, the Reporters of the Restatement write:
The Convention [] creates obligations beyond those imposed by customary international law. It attaches personal criminal responsibility to all individuals who commit, participate in, incite, abet, encourage or co-operate in the crime. Art. III. The Convention also requires states to suppress, prevent any encouragement of, and punish apartheid. Among parties to the Convention, apartheid is also effectively made a subject of universal jurisdiction. Art. IV.
Restatement (Third) of Foreign Relations Law § 702 reporters’ note 7. Thus, the Reporters recognize that the Apartheid Convention’s imposition of liability on private parties not acting under color of law represented a departure from customary international law.[9] Moreover, while it may be an overstatement to describe the list of countries that have ratified the Convention as a rogues’ gallery of human rights violators, the Convention has not been ratified by the United States, most other mature democracies, or other states that play a significant role in international affairs, including three of the five permanent members of the United Nations Security Council — the United States, the United Kingdom, and France. Indeed, it has not been ratified by the post-apartheid Republic of South Africa. Thus, it is not a persuasive source of customary international law on this point. See Flores v. S. Peru Copper Corp., 414 F.3d 233, 257 (2d *320 Cir.2003) (Cabranes, /.) (“[T]he more States that have ratified a treaty, and the greater the relative influence of those States in international affairs, the greater the treaty’s evidentiary value.”). Dean Koh made a similar point in an analogous context when he wrote:
[T]hose who advocate the use of international and foreign sources in U.S. constitutional interpretation [as he does] are not urging U.S. courts to defer automatically to some kind of global “nose count.” Instead, they are suggesting that the practices of other mature democracies — not those that lag behind developmentally — constitute the most relevant evidence of ... the “evolving standards of decency that mark the progress of a maturing society.”
Harold Hongju Koh, International Law as Part of Our Law, 98 Am. J. Int’l L. 43, 56 (2004). Under these circumstances, for the same reason that the Apartheid Convention is not a source for the exercise of universal jurisdiction, ante at 304-06, Judge Sprizzo properly rejected it as a source for extending the scope of liability to private actors who aided and abetted apartheid in South Africa.
The other international agreement identified by Judge Sprizzo that expressly recognizes liability for private persons is the Convention on the Prevention and Punishment of the Crime of Genocide, opened for signature Dec. 9, 1948, 102 Stat. 3045, 78 U.N.T.S. 277 (“Genocide Convention”). The near-unanimous adoption of the convention constitutes concrete evidence of a peremptory norm that has become part of customary international law. The problem with the invocation of the Genocide Convention — aside from the issue whether the complaints here sufficiently allege activity constituting genocide — is that when Congress enacted legislation to implement the agreement, see Genocide Convention Implementation Act of 1987, Pub.L. 100-606, Nov. 4, 1988, 102 Stat. 3045, codified at 18 U.S.C. § 1091 et seq., it expressly provided that the Act shall not “be construed as creating any substantive or procedural right enforceable by law by any party in any proceeding.” 18 U.S.C. § 1092.
In Kadic, which was decided prior to Sosa, we held that “the legislative decision not to create a new private remedy does not imply that a private remedy is not already available under the Alien Tort Act.” 70 F.3d at 242. As Judge Newman explained:
Nothing in the Genocide Convention Implementation Act or its legislative history reveals an intent by Congress to repeal the Alien Tort Act insofar as it applies to genocide, and the two statutes are surely not repugnant to each other. Under these circumstances, it would be improper to construe the Genocide Convention Implementation Act as repealing the Alien Tort Act by implication.

Id.

After Sosa, however, the issue for us to decide is not whether the Genocide Convention Implementation Act implicitly repealed the ATCA insofar as it applies to genocide. As Judge Katzmann acknowledges, “Sosa ... deviate[d] from our case law in one crucial respect. We had allowed cases to proceed under the ATCA on the assumption that when plaintiffs alleged violations of well-established international law, their ‘causes of action are statutorily authorized.’ ” Op. of Judge Katzmann ante at 265 (quoting Kadic, 70 F.3d at 246). Sosa “flatly rejected this notion.” Id. Instead, we are now required to determine “whether to recognize a common-law cause of action to provide a remedy for the alleged violation” of international law. Id. ante at 266. Thus, we have to address the threshold question of whether to recognize a civil cause of action under *321 the ATCA for genocide where Congress has quite plainly indicated its intention that such a cause of action should not be available.
Judge Katzmann appears to acknowledge that, notwithstanding Kadic, the issue whether to recognize a cause of action for genocide based on the ATCA must be considered anew in light of Sosa. Nevertheless, he would “leave it to the district court to address in the first instance should it undertake to decide whether to recognize a cause of action.” Op. of Judge Katzmann ante at 283 n.18. Instead of deciding an issue that we should and must resolve, Judge Katzmann’s disposition of this issue invites a game of ping-pong with Judge Sprizzo, in which I decline to participate.
The Genocide Convention Implementation Act should shut the door to the recognition of a cause of action under the ATCA for violation of the international law norm that it implements, because it would be an abuse of our discretion to expand the scope of ATCA liability to causes of action that Congress indicated its intent to proscribe. We should not “override a clear indication from the political branches that a ‘specific, universal, and obligatory’ norm against genocide is not to be enforced through a private damages action[.]” Sosa, 542 U.S. at 749, 124 S.Ct. 2739 (Scalia, /., concurring in part and concurring in the judgment).
(c) Liability of Corporations
In Sosa, the Supreme Court directed federal courts to determine “whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or an individual.” Id. at 732 n. 20, 124 S.Ct. 2739. Judge Katzmann, who agrees with me that the issue of the scope of liability is governed by international law, draws no distinction between a corporation and an individual. Nor do our decisions in cases invoking jurisdiction under ACTA. Nevertheless, the specific issue of corporate liability under customary international law was not discussed, nor was it raised by the parties, in any of those cases. See, e.g., Bigio, 239 F.3d 440; Flores, 414 F.3d 233. Consequently, they are simply not apposite here, because “[questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.” Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925).
There is a significant basis for distinguishing between personal and corporate liability. Where the private actor is an individual, he is held liable for acts which he has committed and for which he bears moral responsibility. On the other hand, “legal entities, as legal abstractions can neither think nor act as human beings, and what is legally ascribed to them is the resulting harm produced by individual conduct performed in the name or for the benefit of those participating in them or sharing in their benefits.” M. Cherif Bas-siouni, Crimes Against Humanity in International Criminal Law 378 (2d ed.1999). Thus, the issue here is whether an artificial entity that is allegedly used as a vehicle for the commission of a crime against humanity may be held vicariously liable.
The sources evidencing the relevant norms of international law at issue plainly do not recognize such liability. While the London Charter, which created the International Military Tribunal (the “IMT”) at Nuremberg, does not explicitly limit its jurisdiction to “natural persons,” it seems clear from its language and context that it *322 conferred jurisdiction only over the prosecution of individuals. Specifically, the Nuremberg Tribunal was empowered “to try and punish persons who, acting in the interests of the European Axis countries, whether as individuals or as members of organizations,” committed any of several enumerated crimes. Charter of the IMT art. 6, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279 (the “London Charter” or the “Charter”) (emphasis added).[10] Moreover, in rejecting the defense argument that “international law is concerned with the actions of sovereign states, and provides no punishment for individuals,” the Nuremberg Tribunal held that “[cjrimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced.” The Nuremberg Trial, 6 F.R.D. 69, 110 (1946); 1 Trial of the Major War Criminals 223 (William S. Hein & Co., Inc. 1995) (1947). See also Ernst Schneeberger, The Responsibility of the Individual under International Law, 35 Geo. L.J. 481, 489 (1947) (“[I]n the last resort responsibility under international law can only be responsibility of an individual....”).
Indeed, the distinction between corporate and individual responsibility is illustrated by The I.G. Farben Case in which corporate officers were charged with “acting through the instrumentality of Farben” in committing various crimes against humanity. United States v. Krauch (“The I.G. Farben Case”), 7 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10 14, 39, 50, 59 (1952). Nevertheless, the notorious I.G. Farben was not named as a defendant. Id. at 11-14. Nor were any other corporations charged with crimes at Nuremberg. “In fact, in the Nuremberg trials, this point of lack of corporate liability appeared to have been explicitly stated.” In re Agent Orange Product Liab. Litig., 373 F.Supp.2d 7, 57 (E.D.N.Y.2005) (Weinstein, /.).
In 1948, the United Nations General Assembly asked the International Law Commission (the “ILC”), a United Nations body, to study the possibility of creating an international judicial tribunal, which ultimately emerged in the form of the International Criminal Court (the “ICC”), to prosecute genocide and other crimes. Under the auspices of the ILC, the Committee on International Legal Jurisdiction began to study the issue in 1951, and it released its report in 1953. See U.N. GAOR, 9th Sess., Supp. No. 12, U.N. Doc. A/2645 (1954). The Committee considered a proposal by Australia to grant the international court jurisdiction over corporations. Id. ¶ 85. The proposal was soundly defeated because “it was undesirable to include so novel a principle as corporate criminal responsibility in the draft statute.” Id.
More than forty years later, during negotiations for the Rome Statute, pursuant to which the ICC was created, France proposed bringing corporations and other juridical persons (though not States) within the jurisdiction of the ICC. That proposal was again rejected, for three principal *323 reasons: (1) “from a pragmatic point of view it was feared that the ICC would be faced with tremendous evidentiary problems when prosecuting legal entities”; (2) “from a more normative-political point of view it was emphasized that the criminal liability of corporations is still rejected in many national legal orders, and international disparity which could not be brought in concord with the principle of complementarity”; and (3) “it was felt morally obtuse for States to insist on the criminal responsibility of all entities other than themselves.” Albin Eser, Individual Criminal Responsibility, in 1 Antonio Cassese et al., The Rome Statute of the International Criminal Court: A Commentary 767, 778-79 (2002) (footnotes omitted). Thus, the Rome Statute provides for jurisdiction over only “natural persons.” The Rome Statute of the ICC art. 25(1), opened for signature July 17, 1998, 37 I.L.M. 999, 1016 (entered into force July 1, 2002) (“The Rome Statute”).
Similarly, Article III of the Apartheid Convention provides that “[ijnternational criminal responsibility shall apply, irrespective of the motive involved, to individuals, members of organizations and institutions and representatives of the State.... ” Article 4 of the Genocide Convention is to the same effect. Specifically, it provides that “[pjersons committing genocide or any of the other acts enumerated in [ajrticle 3 shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals.” The statutes for the International Criminal Tribunal for the former Yugoslavia (“ICTY”) and International Criminal Tribunal for Rwanda (“ICTR”) also confer jurisdiction only over “natural persons.” See Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia Since 1991 art. 25(1), adopted May 25, 1993, S.C. Res. 827, U.N. Doc. S/RES/827 (the “ICTY Statute”); Statute of the International Criminal Tribunal for the Prosecution of Persons Responsible for the Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States Between 1 January 1994 and 31 December 1994 art. 5, adopted Nov. 8, 1994, S.C. Res. 955, U.N. Doc. S/RES/955 (the “ICTR Statute”).
Likewise, the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (“Torture Convention”), contemplates violations by “persons,” which in the agreement’s textual context can only mean natural persons. See Torture Convention arts. 4(1), 6(1), 6(3), adopted Dec. 10, 1984, 1465 U.N.T.S. 85, 23 I.L.M. 1027. The language of the TVPA, which executed in part the Torture Convention, Flores, 414 F.3d at 247 n. 20, provides further support for the fact that customary international law has not recognized corporate liability. Under the TVPA, the term “individual” describes both those who can violate its proscriptions against torture, as well as those who can be victims of torture. Specifically, the TVPA provides that “[a]n individual who ... subjects an individual to torture shall ... be liable for damages to that individual,” and it defines “torture” as “any act, directed against an individual ... by which severe pain or suffering ... is intentionally inflicted on that individual.” Id. §§ 2(a)(1), 3(b)(1) (emphasis added). As Judge Weinstein recently wrote:
[b]oth from context and common sense only natural persons can be the “individual” victims of acts that inflict “severe pain and suffering.” See [TVPA § 3(b)l]. Because the TVPA uses the *324 same term “individual” to identify offenders, the definition of “individual” within the statute appears to refer to a human being, suggesting that only natural persons can violate the Act. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (noting that “[a]bsent some congressional indication to the contrary, [courts] decline to give the same term in the same Act a different meaning depending on whether the rights of the plaintiff or the defendant are at issue”); see also Beanal v. Freeport-McMoRan, Inc., 969 F.Supp. 362, 381-82 (E.D.La. 1997) (“[T]he plain meaning of the term ‘individuar does not ordinarily include a corporation.”), aff'd by 197 F.3d 161 (5th Cir.1999).
In re Agent Orange Product Liab. Litig., 373 F.Supp.2d at 56.
The same is true with respect to the statute making torture committed outside the United States a federal offense. 18 U.S.C. § 2340 et seq. Section 2340 provides that, “[a]s used in this chapter ... ‘torture’ means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering ... upon another person within his custody or physical control ....” Id. § 2340(1). Because here, as in the TVPA, the context indicates that the word “person” refers to natural persons, the general rule that the word “person” when used in any Act of Congress includes corporations, unless the context indicates otherwise, 1 U.S.C. § 1, is not applicable here. See Rowland v. Cal. Men’s Colony, Unit II Men’s Advisory Council, 506 U.S. 194, 199, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993) (“ ‘Context’ here means the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts.... ”).
These sources are not undermined by Professor Henkin’s suggestion that, “[a]t this juncture[,] the Universal Declaration [of Human Rights (G.A. Res. 217A (III), U.N. Doc. A/180 (1948) ] may also address multinational companies.” Louis Henkin, The Universal Declaration at 50 and the Challenge of Global Markets, 25 Brook. J. Int’l L. 17, 24 (1999). Relying on the Preamble to the Declaration, Professor Henkin argued that it “is ‘a common standard for all people and all nations.’ It means that ‘every individual and every organ of society shall strive — by progressive measures ... to secure their universal and effective recognition and observance among the people of member states.’ Every individual includes juridical persons.” Id. at 24-25. The Supreme Court, however, has held that the Declaration “does not of its own force impose obligations as a matter of international law.” Sosa, 542 U.S. at 734, 124 S.Ct. 2739. Moreover,
it is [also] important to keep in mind what exactly the Preamble expects of such individuals and organs: that they “promote” respect for the rights set forth in the Declaration by ‘teaching and education’ and by supporting “progressive national and international measures.” The language is thus consistent with the idea that legal obligations bind corporations only to the extent that further “national and international measures” are taken.
Carlos M. Vázquez, Direct vs. Indirect Obligations of Corporations Under International Law, 43 Colum. J. Transnat’l L. 927, 942 (2005).
Nor are the sources rejecting corporate liability undermined by two international conventions and a Security Council resolution, all of which post-date the dismantling of apartheid. See The United Nations Convention Against Transnational Organized Crime art. 5(l)(b), Jan. 8, 2001, U.N. *325 GAOR, 55th sess., Supp. No. 49, U.N. Doc. A/45/49; Convention on Combating Bribery of Foreign Public Officials in International Business Transactions arts. 1(2) & 2, Dec. 18,1997, 37 I.L.M. 1 (1998); S.C. Res. 1566, U.N. Doc. S/RES/1566 (Oct. 8, 2004); Mandatory Action to Fight Terrorism, S.C. Res. 1373 ¶ 1(d), U.N. Doc. S/RES/1373 (Sept. 28, 2001); International Convention for the Suppression of the Financing of Terrorism, adopted Dec. 9, 1999, G.A. Res. 109, U.N. GAOR 54th Sess., 76th plen. mtg., U.N. Doc. A/RES/54/109, 39 I.L.M. 270 (2000). While each of these sources call upon parties to enact measures to impose some kind of liability on legal persons in accordance with their own domestic legal principles, none of them directly impose any liability on corporations. Without an analysis of the laws enacted by the various signatories, it is impossible to draw any conclusions regarding the practice of states with regard to the issue of the degree of corporate liability for violation of international law norms.[11] Indeed, as Professor Bassiouni has observed, although “contemporary international efforts to deal with organized crime, corruption, and drug trafficking” are moving in the direction of corporate liability “these new concepts of corporate criminal responsibility have not yet found their way into [customary international law].” Bassiouni, supra, at 377 (internal quotation marks and footnotes omitted). See also Steven R. Ratner & Jason S. Abrams, Accountability for Human Rights Atrocities in International Law: Beyond the Nuremberg Legacy 16 (2d ed. 2001) (“It remains unclear [ ] whether international law generally imposes criminal responsibility on groups and organizations.”).
In sum, the issue here is not whether policy considerations favor (or disfavor) corporate responsibility for violations of international law. Cf. Carlos M. Vázquez, Direct v. Indirect Obligations of Corporations Under International Law, 43 Colum. J. Transnat’l L. 927, 932-959 (2005) (acknowledging that very few norms apply directly to corporations under “international law as it exists today” and outlining arguments for why “international law should move in the direction of generally extending human rights obligations of states to private corporations”). Instead, it involves a determination of what the law was during the relevant period. Indeed, the Supreme Court has held that the retroactive application of statutes enacting civil liability is presumptively inappropriate even where the conduct giving rise to liability was already proscribed and the newly enacted legislation simply increased the scope of liability for damages. Landgraf v. USI Film Prods., 511 U.S. 244, 281-86, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).
“[T]he presumption against retroactive legislation is [not only] deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic,” id. at 265, 114 S.Ct. 1483, but is also reflected in customary international law. As one scholar has noted, “[a] further traditional corollary of the nullum crimen sine lege principle — namely, the notion of non-retroactivity — views the principle of legality from a temporal perspective: conduct may be punished only on the basis of a norm that came into force prior to when the conduct occurred.” Susan Lamb, Nul-lum Crimen, Nulla Poena Sine Lege in *326 International Criminal Law, in Cassese et al., supra, at 733, 751 (emphasis in the original). Indeed, “[t]he applicability of the nullum crimen principle to serious breaches of international humanitarian law was by 1998 sufficiently well-accepted that its inclusion within the Rome Statute was seen as necessary....” Id. at 755. See also Prosecutor v. Tadic, 36 I.L.M. 908, 945, Case No. IT-94-1-T, Opinion and Judgment ¶ 654 (Trial Chamber May 7, 1997) (the International Tribunal “must apply customary international law as it stood at the time of the offences”).
Although the precise date on which the heart of the apartheid regime stopped beating may be difficult to pinpoint, the executive order by President George H.W. Bush on July 10, 1991, terminating United States sanctions against the country, provides one guidepost. Exec. Order No. 12,-769, 56 Fed.Reg. 31855 (July 10, 1991), reprinted in 22 U.S.C. § 5061 (2004). By that order, the President concluded as of that date that the Government of South Africa had: (1) released all persons persecuted for their political beliefs or detained unduly without trial, and it also released Nelson Mandela; (2) repealed the state of emergency in effect on the date of enactment of [the “Comprehensive Anti-Apartheid Act of 1986”] and released all detainees held under such state of emergency; (3) unbanned democratic political parties and permitted the free exercise by South Africans of all races of the right to form political parties, express political opinions, and otherwise participate in the political process; (4) repealed the Group Areas Act and the Population Registration Act and instituted no other measures with the same purposes; and (5) agreed to enter into good faith negotiations with truly representative members of the black majority without preconditions. See Comprehensive Anti-Apartheid Act of 1986, Pub.L. No. 99-440 § 311(a) (1986). Because the only sources of customary international law that suggest some movement toward the recognition of corporate liability postdate the collapse of the apartheid regime, and because the established norm during the apartheid era was that corporations were not responsible legally for violations of norms proscribing crimes against humanity, the complaints are subject to dismissal on this ground alone.
3. The Concurring Opinions
(a) Judge Hall’s Concurring Opinion
Judge Hall flatly ignores the holding of the Supreme Court that the second consideration in deciding whether to accept jurisdiction over a cause of action alleging a violation of the law of nations “is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual.” Sosa, 542 U.S. at 732 n.20, 124 S.Ct. 2739. Instead of undertaking an analysis of a given norm of international law to determine the scope of liability of a private actor, Judge Hall concludes that international law is irrelevant and that once a violation of a given norm is alleged, ATCA subjects a private party to liability if he aided-and-abetted that violation.
Judge Hall’s concurring opinion is premised on the assumption that, even though the ATCA does not by its terms encompass aiding-and-abetting liability, it should be construed as if it contains such language. This aspect of Judge Hall’s opinion not only contradicts Sosa and Kadic, it does disservice to the holding of the leading Supreme Court case addressing the issue of accessorial liability for violations of statutes that create civil causes of action, Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 114 S.Ct. *327 1439, 128 L.Ed.2d 119 (1994). In that case, the Supreme Court observed that:
Congress has not enacted a general civil aiding and abetting statute — either for suits by the Government (when the Government sues for civil penalties or in-junctive relief) or for suits by private parties. Thus, when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant’s violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.
Id. at 182. Central Bank, to be sure, only stands for the proposition that when Congress enacts a law creating a private right of action for violation of a statute, “there is no general presumption that the plaintiff may also sue aiders and abettors.” Id. That decision, however, does not preclude civil liability for aiding-and-abetting in cases “where Congress’ intent is clear from the language and structure of the statute itself as well as from the legislative history.” Boim, 291 F.3d at 1019.
Boim, upon which Judge Hall relies, concerns the issue of liability for aiding- and-abetting international terrorism in violation of 18 U.S.C. § 2333(a). While the statute, creating the civil cause of action, 18 U.S.C. § 2339A, did not in haec verba provide for aiding-and-abetting liability, accomplice liability was implicit in the definition of international terrorism. Thus, in distinguishing Central Bank, the Seventh Circuit held that:
Unlike section 10(b) [the statute at issue in Central Bank], Congress also expressed an intent in section 2333 to make civil liability at least as extensive as criminal liability. The statute defining “international terrorism” includes activities that “involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State.” 18 U.S.C. § 2331(1). This language, embracing activities that “involve” violent acts, taken at face value would certainly cover aiding and abetting violent acts. Remember, too, the criminal laws include 18 U.S.C. § 2, which creates liability for aiding and abetting violations of any other criminal provisions. By incorporating violations of any criminal laws that involve violent acts or acts dangerous to human life, Congress was expressly including aiding and abetting to the extent that aiding and abetting “involves” violence.
Id. at 1020.
The language of the ATCA, like the language of the statute at issue in Boim, can support the recognition of a cause of action for aiding-and-abetting. Nevertheless, it does so only if the plaintiff invokes an international law norm that provides for such liability. Nothing in the language of the ATCA supports the broad holding that Congress intended to provide a forum to adjudicate causes of action for aiding-and-abetting the violation of a norm when such conduct did not fall within the scope of the norm. Indeed, the same Congress that enacted the ATCA, without reference to aiding-and-abetting liability, explicitly made it a crime to aid-and-abet acts of piracy, a violation of the law of nations. See Act of April 30, 1790, ch. 9, § 10, 1 Stat. 112, 114 (1790). This shows that, despite Judge Hall’s suggestion to the contrary, Op. of Judge Hall ante at 288 n. 5, the First Congress “knew how to impose aiding and abetting liability when it chose to do so,” id. (quoting Central Bank, 511 U.S. at 174, 114 S.Ct. 1439), with respect to violations of the law of nations.
*328 In the absence of either statutory language or legislative history to support his interpretation of the ATCA, Judge Hall’s opinion argues that “the Founding Generation nevertheless understood that ATCA encompassed aiding and abetting liability.” Op. of Judge Hall ante at 288 n.5. This contention is beside the point, for the reasons discussed above, and it is also wrong. In Central Bank, the plaintiff argued that “Congress legislated with an understanding of general principles of tort law and that aiding and abetting liability was ‘well established in both civil and criminal actions by 1934/ ” the year the statute at issue was adopted. 511 U.S. at 181, 114 S.Ct. 1439 (citation omitted). The Court’s opinion suggested that the plaintiff there relied on the principle derived from the Restatement (Second) of Torts (1979), which provides that a person is liable for another’s torts if he “knows that the other’s conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. ...” Id. § 876(b); see Central Bank, 511 U.S. at 181, 114 S.Ct. 1439. The principle of “substantial assistance,” which Judge Hall adopts, initially appeared in the Restatement (First) of Torts in 1939, of which Prosser wrote:
The form of the Restatement is perhaps unfortunate, in that it seeks to reduce the law to a definite set of black-letter rules or principles, ignoring all contrary authority — since the law of torts in its present stage of development does not lend itself at all readily to such treatment. There is room for suspicion that the courts have tended to cite the Restatement when they are already in agreement with it, and to ignore it when they are not, so that the impressive list of references to it in the cases may be somewhat misleading; and there are those who have disagreed with many of its’conclusions, and even denounced the whole project.
William L. Prosser, Law of Torts § 4, at 20-21 (4th ed.1971).[12] Perhaps for this reason, the Supreme Court could write fifty-five years after the publication of the first Restatement that the doctrine of aiding-and-abetting in civil cases “has been at best uncertain in application ... with the common-law precedents ‘largely confined to isolated acts of adolescents in rural society.’ ” Central Bank, 511 U.S. at 181, 114 S.Ct. 1439 (quoting Halberstam, 705 F.2d at 489). If there was no general understanding that civil aiding-and-abetting liability was “well established in ... civil ... actions by 1934,” id. at 181, 114 S.Ct. 1439 (citation omitted), it is difficult to understand how it can be asserted that such an understanding was present in 1789 when Congress enacted the ATCA.
The historical support for the proposition that “the Founding Generation nevertheless understood” that civil liability for aiding and abetting international law violations was contemplated under the ATCA, Op. of Judge Hall ante at 288 n.5, is ambiguous at best. The lynchpin for this argument is Attorney General William Bradford’s 1795 opinion, Breach of Neutrality, *329 1 Op. Atty. Gen. 57 (1795). In his opinion, Bradford specifically addressed a question posed to him, namely, whether American citizens who “voluntarily joined, conducted, aided, and abetted a French fleet in attacking the settlement, and plundering or destroying the property of British subjects on that coast” could be subject to criminal prosecution in the United States. Id. at 58. In responding to this question, Bradford expressed some doubt about a criminal prosecution, but he stated that
there can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a civil suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the law of nations, or a treaty of the United States....
Id. at 59.
Because Bradford did not distinguish between primary and secondary liability, it is not possible to discern that, when he said a cause of action would lie for “these acts of hostility,” he was focusing on aiding-and-abetting as opposed to direct participation in the conduct that violated a treaty of the United States. Indeed, because the conduct involved direct participation by American citizens, who acted with the intent to make the attack succeed, it seems likely that Bradford recognized all of the perpetrators as joint tortfeasors, as that term was understood at the time. As the D.C. Circuit explained in Halber-stam:
Prosser notes that “[t]he original meaning of ‘joint tort’ was that of vicarious liability for concerted action. All persons who acted in concert to commit a trespass, in pursuance of a common design, were held liable for the entire result.” W. Prosser, Law of Torts § 46, at 291 (4th ed.1971). His illustration portrays a standard situation that involved this “joint tort”: combined action by tortfeasors on the scene together — “one might have battered the plaintiff, while another imprisoned him, and a third stole his silver buttons.” Id. (footnote omitted). Each was responsible for the others’ actions.
705 F.2d at 476-77. Moreover, Prosser goes on to explain that the essential element of a joint tort was “the pursuance of a common plan or design to commit a tortious act.” Prosser, supra, at 292.
Two early cases cited in Judge Hall’s opinion, Talbot v. Jansen, 3 U.S. (3 Dall.) 133, 1 L.Ed. 540 (1795), and Henfield’s Case, 11 F. Cas. 1099 (C.C.D.Pa.1793), neither of which involved the ATCA, bear out Prosser’s analysis. Both cases arose from the seizure of a vessel not by pirates, but by privateers, “armed vessels that are owned, equipped and officered by one or more private persons, but sailing under a commission, usually called letters of marque, from a belligerent state, which empowers the person or persons to whom it is granted to attack and seize, at sea, vessels or other property of its enemy.” 3 James Fairbanks Conley, Privateering, in Cy-clopdia of Political Science, Political Economy, and the Political History of the United States 361 (John J. Lalor ed., 1899). The use of privateers in this way was recognized under international law. Id. Nevertheless, Talbot’s and Henfield’s legal problems in these cases derived from the fact that they were United States citizens engaged in acts of war against nations with which the United States was at peace.
Talbot was an admiralty case. Talbot himself was the captain of a privateer commissioned by the Republic of France. Henfield’s Case was a criminal prosecution, and a most unusual one at that, of the prize-master of a privateer also commissioned by France. Henfield was not *330 charged with conduct proscribed by an act of Congress. The undelivered grand jury charge of Chief Justice Jay, upon which Judge Hall relies, Op. of Judge Hall ante at 288 n.5, appears to reflect the practice of most of the early justices “to create crimes by judicial fiat[, which] was particularly infuriating to the vast majority of citizens who believed the Constitution had established a government of limited powers.” Jean Edward Smith, John Marshall: Definer of a Nation 284 (1996). The Supreme Court repudiated the practice in United States v. Hudson, 11 U.S. (7 Cranch) 32, 3 L.Ed. 259 (1812). Under these circumstances, it is not surprising that Henfield, who was not charged with aiding-and-abetting, was acquitted because “he was ignorant of the unlawfulness of his undertaking.” Henfield’s Case, 11 F. Cas. at 1122 n.7. Nor is it surprising, given Henfield’s role as a principal (or as a joint tortfeasor in the civil context), that Jay’s grand jury charge, which was written to apply “to the class of offenders, of whom Henfield was one,” id. at 1105 n.2, did not define aiding-and-abetting, and that the judge who actually charged the Henfield grand jury did not allude to the concept altogether. Id. at 1105-09.
In sum, Bradford’s opinion and the cases cited by Judge Hall do not support the extraordinary proposition that Congress intended the ATCA to permit jurisdiction to be exercised over claims of aiding-and-abetting without regard to whether the conduct at issue violated an international law norm. Moreover, Judge Hall compounds his flawed discussion of this issue by adopting a standard for aiding-and-abetting that is vague and inappropriate in the present context. As if the language of section 876(b) of the Restatement (Second) of Torts imposing liability for “substantial assistance” was not vague enough, he endorses a five-factor test, first suggested by the Restatement and then adopted in Hal-berstam, to “assess whether the defendant’s encouragement or assistance was sufficiently substantial to support liability.” Op. of Judge Hall ante at 287. These factors are “the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other tortfeasor and his state of mind.” Id.
The “state of mind” factor, as applied in Halberstam, includes a “desire to make the venture succeed.” 705 F.2d at 488. Nevertheless, despite his reliance on Hal-berstam, Judge Hall’s opinion fails to even allude to this critical state-of-mind element. Moreover, even under Halber-stam’s formulation, it is only one factor among five for determining whether “substantial assistance” was provided. Such a five-prong test for determining whether assistance was substantial hardly provides the clear guidance necessary to those engaging in commercial transactions.
By incorporating a vague “substantial assistance” standard, this newly minted theory of aiding-and-abetting liability will create many practical problems harmful to the political and economic interests of the United States. As the United States observes in its amicus brief, the decision to embrace this broader scope of liability under the ATCA will generate tremendous uncertainty for private corporations, who will be reluctant to operate in countries with poor human rights records for fear of incurring legal liability for those regimes’ bad acts. Br. for the U.S.A. as Amicus Curiae at 13. This uncertainty, in turn, will undermine efforts by the United States to encourage reform in those countries through active economic engagement, id., and will deter the free flow of trade and investment more generally. Id. at 18.
(b) Judge Katzmann’s Concurring Opinion
Unlike Judge Hall, Judge Katzmann looks to international law to resolve the issue of whether a private party or a corporation (he draws no distinction between *331 the two) can be held liable for aiding-and-abetting a violation of international law otherwise applicable to state actors or to private parties acting under color of law. While Judge Katzmann properly looks to international law, he disregards the holding in Sosa and our own holdings in Kadic and Fiicci, which I have already discussed at some length, ante at 311-12, that require a norm-by-norm analysis to determine whether “international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual.” Sosa, 542 U.S. at 732 n.20, 124 S.Ct. 2739 (emphasis added). Judge Katzmann declines to undertake this analysis because that “is not how the inquiry is undertaken by international tribunals whose jurisdiction is limited by customary international law.” Op. of Judge Katzmann ante at 279.
We do not enjoy the freedom to disregard the guidance of the Supreme Court and adopt the practice of international tribunals — particularly the unorthodox practices of the ITCY and the ICTR, see post at 333-37. Moreover, contrary to Judge Katzmann’s suggestion, the jurisdiction of the post-apartheid international tribunals to which he refers, principally the ICTY, are conferred by the Security Council resolutions creating them. They are not “limited by international law.” Instead, these custom-made statutes, which address particular international crises are sometimes contrary to evolving norms of customary international law. This is true with respect to the statute creating the ICTY, post at 333-34, and the UN Security Council Resolution calling for the establishment of the Special Court for Sierra Leone. The latter provides only for the prosecution of persons “who bear the greatest responsibility for the commission of the crimes [in violation of crimes against humanity].” S.C. Res. 1315, U.N. Doc. S/RES/1315 (Aug. 14, 2000). The resolution was implemented in article 1 of the Agreement Between the United Nations and the Government of Sierra Leone on the Establishment of a Special Court for Sierra Leone.
More significantly, in the cases on which Judge Katzmann relies — those of the ICTY — the tribunal was not required to make any inquiry regarding the issue of whether “international law extends the scope of liability for a given norm to the perpetrator being sued if the defendant is a private actor such as a corporation.” Sosa, 542 U.S. at 732 n. 20, 124 S.Ct. 2739.
The Statute of the ICTY, article 5, followed the London Charter, the Judgment of the Nuremberg Tribunal, construing it, and the tribunals empaneled pursuant to CCL 10, all of which required a connection between crimes against humanity and war crimes.[13] Because private parties are individually responsible for crimes committed in the course of a war, this connection made it unnecessary for the Nuremberg Tribunal or the CCL 10 tribunals to address the scope of liability of private actors as aiders-and-abetters. See Kadic, 70 F.3d at 239-41; see also id. at 242-43 (“Plaintiffs also contend that the acts of murder, rape, torture, and arbitrary detention of civilians, committed in the course of hostilities, violate the law of war. Atrocities of the types alleged here have long been recognized in international law as violations of the law of war.... The liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II.”). Thus, ICTY cases provide no support for failing *332 to follow the instruction of the Supreme Court, one that is consistent with our own holding in Kadic and Wiwa, which requires an analysis of the particular norm the defendant is accused of violating to determine whether a private party may be held responsible as an aider-and-abettor.[14]
While Judge Katzmann erroneously concludes that there was — during the period when the crimes alleged here took place— an independent norm of customary international law, making private actors legally responsible as aiders-and-abetters without regard to whether the particular norm they allegedly violated imposed such liability, he correctly rejects the “substantial assistance with knowledge” standard for this newly minted norm that Judge Hall finds in section 876(b) of the Restatement (Second) of Torts. Instead, he “conclude[s] that a defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime.” Op. of Judge Katzmann ante at 277. The basis for this formulation is article 25 of the Rome Statute. Rome Statute of the ICC, opened for signature July 17, 1998, 37 I.L.M. 999, 1016 (entered into force July 1, 2002).
Specifically, article 25 of the Rome Statute provides that a person shall be criminally responsible and liable for punishment for specified crimes against humanity if that person:
(c) For the purpose of facilitating the commission of such a crime, aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission;
(d) In any other way contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose. Such contribution shall be intentional and shall either:
(i) Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of a crime within the jurisdiction of the Court; or
(ii) Be made in the knowledge of the intention of the group to commit the crime;
Id. art, 25(3)(e), (d).
This article is significant because it makes clear that, other than assistance rendered to the commission of a crime by a group of persons acting with a common purpose, a defendant is guilty of aiding- and-abetting the commission of a crime only if he does so “[f|or the purpose of facilitating the commission of such a crime ... including providing the means for its commission.” Id. The same standard was adopted by the United Nations Transitional Administration in East Timor (“UN-TAEAT”). See UNTAET, June 6, 2000, Reg. No.2000/15 § 14.3(c). As one commentator has observed:
With regard to facilitating the commission of a crime, the aider and abettor must act with ‘purpose.’ ... This means more than the mere knowledge that the accomplice aids the commission of the offence, as would suffice for complicity according to the ICTR and ICTY Statutes, rather he must know as well as wish that his assistance shall facilitate the commission of the crime.
Albín Eser, Individual Criminal Responsibility, in 1 The Rome Statute of the *333 International Criminal Court 767, 801 (Antonio Cassese et al, eds.2002) (emphasis in original).
The Rome Statute has been signed by 139 countries and ratified by 105, including most of the mature democracies of the world. I agree that it reflects an international consensus on the issue of the appropriate standard for determining liability for aiding-and-abetting, it is consistent with our own domestic law, see ante at 317-18, and it addresses the concern over the adoption of a “substantial assistance with knowledge” standard raised in the amicus brief filed by the United States. Br. for the U.S.A. as Amicus Curiae at 13. Indeed, the amicus brief appears to endorse the elements set out in article 25(3). Id. at 26 (arguing that “the standard the plaintiffs propose differs materially from the most recent formulations adopted in international practice”) (citing article 25(3) of the Rome Statute). Perhaps more significantly, the standard in article 25(3)(c) of the Rome Statute is consistent with the Ministries Case, discussed at the outset, that holds that the conduct which the defendants allegedly engaged in here was not a violation of customary international law. The Ministries Case, 14 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10 622. These considerations also obviate any concern regarding the failure of the United States to ratify the Treaty of Rome for reasons unrelated to the definition of aiding-and-abetting. See Yousef, 327 F.3d at 92 n. 25.
My point of disagreement with Judge Katzmann relates to the narrow issue of whether there was any “well establish^ ][and] universally recognized” definition of aiding-and-abetting sufficient to be considered customary international law for the purposes of the ATCA during the apartheid era when the defendants allegedly violated customary international law. Op. of Judge Katzmann ante at 277. There was none. See Steven R. Ratner & Jason S. Abrams, Accountability for Human Rights Atrocities in International Law: Beyond the Nuremberg Legacy 130 (2d ed.2001), and the absence of such a definition during this period is significant for the reasons already discussed, ante at 325-27.
Nevertheless, I concur in section II.B of Ms opinion that articulates the customary international law standard for aiding-and-abetting based on the Rome Statute. I do so because it provides a clear standard, adopted by a majority of the panel, for Judge Sprizzo to apply, in deciding whether to grant the plaintiffs’ motion to file amended complaints.[15] Moreover, as applied to the facts in this case, the standard Judge Katzmann adopts is consistent with the Ministries Case — the validity of which has never been questioned.
Judge Katzmann’s opinion, however, does not end with section II.B. Thus, while he does not rely on post-apartheid decisions of the ICTY or the ICTR to support the standard that he enunciates for determining aiding-and-abetting liability, he does rely on those cases to suggest that the “substantial assistance with knowledge” standard for aiding-and-abetting may provide a foundation for future development of the law in this area. I discuss the cases on which he relies to demonstrate why, contrary to Judge Katzmann’s gratuitous suggestion, they do not provide a reliable basis for a broader definition than the one proscribed in the Rome Statute.
(c) The ICTY
By way of background, the ICTY was created by United Nations Security Coun *334 cil Resolution 827, which was passed on May 25, 1993, to prosecute individuals responsible for serious violations of international humanitarian law committed in the former Yugoslavia beginning on January 1, 1991. Under the ICTY Statute, the tribunal has jurisdiction over four clusters of crimes: grave breaches of the 1949 Geneva Conventions, violations of the laws or customs of war, genocide, and crimes against humanity. See ICTY Statute arts. 2-5. Significantly, as previously noted, the ICTY criminalizes crimes against humanity only “when committed in armed conflict.” While this connection with armed conflict is consistent with the London Charter and the Judgement of the Nuremberg Tribunal, ante at 331, the ICTY Statute undermines “subsequent developments de-coupling ‘crimes against humanity’ from the initiation and waging of an aggressive war-” Bassiouni, supra, at 194. Indeed, if we applied this retrograde statute here, it would require the dismissal of the complaints.
Against this backdrop and my earlier discussion of the ICTY statute, I turn to the specific ICTY decisions relied upon by Judge Katzmann. The gruesome facts in the Furundzija case, the principal case which Judge Katzmann cites, are illustrative of the circumstances under which the ICTY chose to address aiding-and-abetting liability. There, two victims, identified as A and D, were apprehended and were brutally interrogated. The ICTY made the following finding with respect to the defendant and his co-defendant, whom it identified as Accused B: “There is no doubt that the accused and Accused B, as commanders, divided the process of interrogation by performing different functions. The role of the accused was to question, while Accused B’s role was to assault and threaten in order to elicit the required information from Witness A and Witness D.” Prosecutor v. Furundzija, 38 I.L.M. 317, 363, Case No. IT-95-17/1-T, Judgment ¶ 130 (Trial Chamber Dec. 10, 1998). While this was an open-and-shut case of joint participation in a violation of international law by members of an armed group in an international conflict, the ICTY panel entered into a confused and rambling discussion of aiding-and-abetting.
This theme animates the other ICTY cases cited by Judge Katzmann. In Tadic, the Trial Chamber found that the defendant, as part of a group proclaiming the creation of an independent Bosnian Serb republic, played an active role in the attack on a majority Muslim town in a predominantly Serb region by, inter alia, beating civilians and forcibly transferring them to concentration camps. E.g., id., Judgement ¶¶ 397, 455, 461. He was also among a group of men who beat, stabbed, and/or killed a number of individuals at such concentration camps in the context of the armed conflict. E.g., id. ¶¶ 235-36, 261, 303, 316, 435, 448. Again, this is a classic ease of joint participation in criminal conduct by state actors in an armed conflict who provided direct and substantial assistance to the “common purpose” of effecting a violation of an international law norm. Id. ¶¶ 730, 735, 738. Indeed, Tadić was expressly cited in Furundzija, as holding that “the accused ‘intentionally assisted directly and substantially in the common purpose of the group’ to commit the offence.” Id. Judgment ¶ 226 (internal citations omitted). See also Prosecutor v. Vasiljević, Case No. IT-98-32-A, Judgment ¶ 134 (App. Chamber Feb. 25, 2004) (The evidence showed that “Appellant knew that the seven Muslim men were to be killed; that he walked armed with the group from the place where they had parked the cars to the Drina River; that he pointed his gun at the seven Muslim men; and that he stood behind the Muslim men with his gun together with the other *335 three offenders shortly before the shooting started.”).
Similarly, in Prosecutor v. Kvočka, Case No. IT-98-30/1-T, Judgment (Trial Chamber Nov. 2, 2001), the defendants were employees of a camp created by Serb Forces in Bosnia Herzegovina, where non-Serbs were detained, killed, and otherwise gravely mistreated. The administrative aide to the commander of the camp was found to have participated in the joint criminal enterprise because his “administrative duties constituted one of many integral cogs in the wheel of a system of gross mistreatment.” Id. Judgment ¶ 460. The other two defendants held individually responsible were both guard shift leaders at the camp. One defendant was convicted on the basis of “substantial evidence presented that the guards on [his] shift beat detainees, sometimes in his presence, and he not only failed to object, but participated on occasion.” Id. ¶ 497. The other guard leader also permitted serious crimes to be committed by those under his command and he personally “perpetrated a number of serious crimes, particularly sexual violence.” Id. ¶ 566. This case is the mirror image of the Dachau Concentration Camp case in which
there was in the camp a general system of cruelties and murders of the inmates (most of whom were allied nationals) and that this system was practiced with knowledge of the accused, who were members of the staff, and with their active participation. Such a course of conduct, then, was held by the court in this case to constitute “acting in pursuance of a common design to violate the laws and usages of war.” Everybody who took any part in such common design was held guilty of a war crime, though the nature and extent of the participation may vary.
Trial of Martin Gottfried Weiss and thirty-nine others, 11 Law Reports of Trials of War Criminals 5, 14 (William S. Hein & Co., Inc. 1997) (1945).[16]
These cases hardly provide a foundation upon which a norm of international law, of the kind Judge Katzmann suggests, can be constructed. Nor do the opinions of the ICTR, to which I now turn.
(d) The ICTR
The ICTR was created on November 8, 1994, by the United Nations Security Council Resolution 995 in order to judge those individuals responsible for serious violations of international law in Rwanda and nearby states, between January 1 and December 31, 1994. Specifically, the defendants there were accused of genocide, crimes against humanity, and violations of Article 3 common to the Geneva Conventions and of Additional Protocol II. The ICTR Statute did not require a connection between a crime against humanity and an armed conflict. While the ICTR and ICTY are separate tribunals they shared the same Appeals Chamber, Op. of Judge Katzmann ante at 278 n.14. Not surprisingly, as Judge Katzmann observes, there was little to distinguish judgments of one from the other. Id. These judgments, as I proceed to show, are equally useless precedent on the issue of liability of private parties for violations of customary international law.
In Prosecutor v. Akayesu, Case No. ICTR-96-4-T, Judgement (Trial Chamber Sept. 2, 1998), the defendant, serving as the local “bourgmestre,” was charged with *336 executing the laws adopted by the communal legislature, had control over the appointment and removal of communal employees, and had ultimate authority over the communal police and any gendarmes put at the communes disposal. Judgement ¶¶ 61-71. Bourgmestres also had significant de facto powers over their constituents, like those of a tribal chief. Id. ¶¶ 72-74. Indeed, the indictment only charges Akayesu with violations performed during his time as a public official. Given the widespread use of public employees and facilities in this conduct, it is clear that Akayesu was a state actor and a joint participant with other state actors.
Similarly, in Prosecutor v. Bagilishema, Case No. ICTR-95-1A-T (Trial Chamber June 7, 2001), and Prosecutor v. Musema, Case No. ICTR-96-13-T (Trial Chamber Jan. 27, 2000), the defendants were not only charged with acts of direct criminal participation in crimes in which they were joint participants, they were significant public officials. Bagilishema, the Mayor of a Rwandan commune, was accused of, inter alia, arming individuals and directing them to attack, personally attacking and killing persons, as well as other official acts encouraging mass killings. See Bagil-ishema, Judgment annex A. Musema was the director of a state-owned tea factory, under the authority of the Rwandan Ministry of Agriculture, who led and participated in attacks on non-Hutus using factory employees and equipment, personally shot at refugees, ordered the rape of one Tutsi woman, and personally raped another woman. See Musema, Judgment § 5.
Finally, in Prosecutor v. Ntakirutimana, Case No. ICTR 96-10-A, ICTR-96-17 (App. Chamber Dec. 13, 2004), the Appeals Chamber summarized the Trial Chamber’s findings of facts, in part, as follows:
The Trial Chamber found 1) in relation to the Mugonei'o Indictment that, in addition to killing Charles Ukobizaba and shooting at Tutsi refugees at the Complex, Gérard Ntakirutimana’s participation in the attacks included procuring ammunition and gendarmes for the attack on the Complex and participation in the attack on Witness SS; and 2) in relation to the Bisesero Indictment that, in addition to killing Esdras and the wife of Nzamwita, pursing and shooting at the refugees, he transported attackers at Kidashya, headed a group of armed attackers at Muyira Hill in June 1994, was at Mutiti Hill in June 1994 with Interahamwe where they shot at refugees in a forest by a church, and participated in attacks in Bisesero during the period April to June 1994.
Id. ¶ 491. This is a classic example of joint participation of persons acting pursuant to a common design. Moreover, the defendants were also direct participants in the offenses for which they were convicted.
Judge Katzmann concedes that the defendants in the ICTY and ICTR cases he cites involved joint participants in violations of international law. Indeed, virtually all of the defendants in these cases were state actors. They hold, at most, that “substantial assistance with knowledge” satisfies the participation necessary for the imposition of liability on joint participants sharing the common purpose of violating a norm of customary international law. This is entirely consistent with the Rome Statute.
Moreover, to the extent that any language in these opinions suggest more than that, it rises only to the level of dicta, of which peremptory norms of international law are not made. Indeed, the leading treatise Judge Katzmann cites explains that “decisions of international tribunals ... exercise considerable influence as an impartial and considered statement of the law by jurists of authority in light of actu *337 al problems which arise before them.” 1 Oppenheim’s International Law: Peace 31 (Robert Y. Jennings & Arthur Watts eds. 9th ed. 1962) (emphasis added). Dicta unrelated to the actual problems which arise before them do not warrant such deference. This is all the more so where dicta are inserted by judges who are using their positions to make law with respect to matters with which they have preconceived views. Yet, a leading jurist and commentator has observed that the practice of “deal[ing] through obiter dicta with legal issues that were incidental, as it were, to the main questions,” was a regular practice of ICTY panels. Antonio Cassese, The ICTY: A Living and Vital Reality, 2 J. Int’l Crim. Just. 585, 589 (2004). The excuse given for this practice is that it provided “clarification [that] might have some value for the future development of international criminal law[.]” Id. As Antonio Cassese, the President of the ICTY and Presiding Judge of the ICTY Trial Chamber, who was one of the judges on the ICTY panel in Furundzija, goes on to explain:
In this connection, one may find much merit in the witty remark reportedly made by a senior member of the ICTY Office of the Prosecutor in 1995, after the Appeals Chamber handed down its lengthy judgment in [Prosecutor v. Tadic, Case No. IT-94-1 (App. Chambers Oct. 2, 1995) (Cassese, Presiding J.)]: ‘We had gone for a steak,’ he said, ‘and have got a whole cow.’ However, international courts operate in a legal system that is notably lacking in many respects. Among other things, the absence of an international law-maker and an international court with compulsory universal jurisdiction entails that many rules are not clear, particularly when they are of customary origin, and are thus open to differing interpretations-hence the need for courts gradually to spell out the contents of those rules, if need be through obiter dicta.
Id. at 590.
Nevertheless, Judge Cassese cautioned that “one should not be oblivious of the possible flaws or abuses. Courts may indulge in legal discussions that not only are peripheral to the ratio decidendi, but may also prove simply academic and sometimes also misleading for future courts pronouncing on the same matters.” Id. This accurately describes the aiding-and-abetting dicta in the ICTY opinions. They do not constitute a foundation strong enough to provide a future basis for rejecting the international consensus achieved by the Rome Statute on the elements of aiding- and-abetting.
Conclusion
I dissent from judgment reversing the dismissal of the complaint for the reasons I have elaborated above. Nevertheless, I concur in section II.A of Judge Katz-mann’s opinion that rejects Judge Hall’s argument that the scope of liability for the violation of the norm of international law must be decided by reference to our own domestic law. I concur as well in section II.B of Judge Katzmann’s opinion that articulates the elements of aiding-and-abetting liability as defined in article 25(b) & (c) of the Rome Statute. These elements are consistent with, if not mandated by, customary international law. I also concur in section II of the per curiam opinion dismissing the TVPA cause of action for the reasons stated in the per curiam opinion and for the additional reason that only natural persons are subject to liability under it.

. The Rome Statute does not apply to “conduct prior to the entry into force of the Statute.” Rome Statute of the International Criminal Court art. 24(1), open for signature July 17, 1998, 37 I.L.M. 999, 1016 (entered into force July 1, 2002). As one commentator explained, "[t]o be acceptable to the broadest possible majority of countries, many of which had dark experiences in the past and had to resort to amnesties or similar solutions to achieve national reconciliation, criminal responsibility under the Rome Statute could not be made retroactive....” Per Saland, International Criminal Law Principles, in The International Criminal Court: The Making of the Rome Statute — Issues, Negotiations, Results 189, 196 (Roy S. Lee ed„ 1999). This may explain why the Republic of South Africa, which never ratified the Apartheid Convention, ratified the Rome Statute.

. The Khulumani plaintiffs also argue that, "[t]he ATS aside, there are independent grounds for jurisdiction in federal court”, namely, diversity of citizenship pursuant to 28 U.S.C. § 1332. Br. for App. at 56. These causes of action, however, are also subject to dismissal based on deference to the Executive Branch's view of the foreign policy impact of allowing them to proceed, and on the doctrine of international comity. See Bi, 984 F.2d at 586-87; Doe v. Exxon Mobil Corp., 473 F.3d 345, 357 (D.C.Cir.2007) (Kavanaugh J., dissenting from denial of writ of mandamus.) The point of disagreement in Exxon, as the majority acknowledged, id., turned on the availability of a writ of mandamus to review the denial of the defendant’s motion to dismiss where the Executive Branch did not unequivocally seek such relief. See also Am. Ins. Ass’n v. Garamendi, 539 U.S. 396, 413-14, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 425, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).

. The jurisdictional statutes cited by the Supreme Court as examples in which Congress has exercised its prerogative to restrict the subject matter jurisdiction of federal district courts include statutes that contain jurisdiction-conferring language identical to that in 28 U.S.C. § 1350. See, e.g., 28 U.S.C. §§ 1345 & 1348 (cited in Arbaugh v. Y & H Corp., 546 U.S. 500, 516 n. 11, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006)). Indeed, in Robinson v. Government of Malaysia, 269 F.3d 133 (2d Cir.2001), in which Judge Katz-mann concurred, we said that the “Alien Tort Claims Act (“ATCA”), 28 U.S.C. § 1350, which provides that '[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States,' similarly identifies certain substantive law violations as jurisdictional pleading requirements.” Id. at 144 n. 13.

. The statute at issue in Bevona, section 102 of the Labor-Management Reporting and Disclosure Act, 28 U.S.C. § 412, did not by its terms restrict the exercise of subject matter jurisdiction. Nevertheless, we held that it had been so construed by the Supreme Court. Bevona, 152 F.3d at 62 (citing Calhoon v. Harvey, 379 U.S. 134, 138, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964)).

. On April 28, 2003, before Sosa was decided, Judge Sprizzo permitted the Ntsebeza plaintiffs to file a third amended complaint. In re S. African Apartheid Litig., 346 F.Supp.2d at 544 n. 8. While some defendants received a copy of such a complaint on May 19, 2003, Joint Motion at 5 n. 2, ''[flhat Complaint was never properly filed.'' In re S. African Apartheid Litig., 346 F.Supp.2d at 544 n. 8. Nevertheless, it was virtually identical to the one previously filed. Id.

. Judge Sprizzo denied the motion to amend because (1) he had previously provided the plaintiffs leave to replead; (2) the plaintiffs' request came “four months after this Court dismissed these actions and more than three months after plaintiffs noticed their appeal’’; (3) allowing them to replead would interfere with “ensuring a speedy appeal’’; and (4) the proposed amendments would have been “fruitless” in light of his ruling that aiding- and-abetting is not recognized under the ATCA. A01139.

. The ICTY held recently that "[w]hile this may have been the case during the Second World War ... the law in relation to crimes against humanity has developed to take into account forces which, although not those of the legitimate government, have de facto control over, or are able to move freely within, defined territory.” Prosecutor v. Tadić, 36 I.L.M. 908, 945, Case No. IT-94-1-T, Opinion and Judgment ¶ 654 (Trial Chamber May 7, 1997); see also Antonio Cassese, Crimes Against Humanity, in Cassese et al., supra, at 353, 357.

. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), which provides the basis for the so-called "symbiotic relationship test” between public and private actors and upon which plaintiffs rely, was one of the Warren Court cases that took an expansive view of state action. The Supreme Court did not employ the “symbiotic relationship” language in Burton, though in a subsequent case, it referred to "the symbiotic relationship between lessor and lessee ... present in Burton.” Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 175, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). "Although neither Burton nor the symbiotic relationship doctrine has been overruled, they have been severely narrowed in scope and diminished as precedent. Supreme Court decisional law has given Burton a very narrow interpretation and, with the possible exception of its decision that a civil litigant’s exercise of a racially based peremptory challenge constitutes state action [Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991)], has rejected every attempt to establish state action on the basis of Burton." 1 Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses § 5.13[A], at 5-90-5-91 (4th ed.2003); see also Sullivan, 526 U.S. at 57-58, 119 S.Ct. 977; Laurence Tribe, American Constitutional Law § 18-3, at 1701 n. 13 (2d ed.1988).

. The Chief Reporter of the Restatement was Professor Louis Henkin of Columbia University. Associated with Professor Henkin as Reporters were Professors Andreas F. Lowenfeld of New York University, Louis B. Sohn of the University of Georgia, and Detlev F. Vagts of Harvard University.

. Article 9 of the London Charter provided that "[a]t the trial of any individual member of any group or organization the Tribunal may declare (in connection with any act of which the individual may be convicted) that the group or organization of which the individual was a member was a criminal organization.” The Nuremberg Trial, 6 F.R.D. at 131-33; 1 Trial of the Major War Criminals 255-57. The consequence of a finding in the main trial that organizations, such as the Schultzstaffeln (more commonly referred to as the S.S.) and the Gestapo, were criminal in nature was that it permitted a finding of guilt against other members of the organization in subsequent trials. See Id.

. As a general rule, treaties, like contracts, "are legally binding on States that become parties to them by consenting to be bound”, and may constitute evidence of a norm of customary international law only if "an overwhelming majority of States have ratified the treaty and those Slates uniformly and consistently act in accordance with its principles.” Flores, 414 F.3d at 256.

. Judge Learned Hand shared Prosser’s concern. Hand "repeatedly ... urged that the Restatements confine themselves to articulating the law 'as it is/ not as it should be; repeatedly, he insisted that the ALI's task was to 'restate, not legislate’.... ” Gerald Gunther, Learned Hand: The Man and the Judge 411 (1994) (internal citations omitted). Indeed, although Hand was a founding member of the ALI and held major positions in it for the rest of his life, he rarely cited the Restatements. Id. at 413. The most that he was willing to say about them was that he found them to be useful " 'on questions which were not controversial and [otherwise took] a long time to look up.' ’’ Id. (internal citations omitted).

. See The Nuremberg Trial, 6 F.R.D. 69, 131, 1 Trial of the Major War Criminals 253-54, Brigadier General Telford Taylor, Final Report to the Secretary of the Army on the Nuer-enberg War Crimes Trials under Control Council Law No. 10, app. B at 224, 228 (William S. Hein & Co., Inc. 1997) (1949). A useful discussion of art. 6(c) of the London Charter, which provided the basis for these holdings, may be found in Bassiouni, supra, 19-30.

. Another reason the ICTY cases are silent on this score is that, while the defendants in these cases may not have been officials of formally recognized states, they were state actors. As we have held, "the state action concept ... requires merely the semblance of official authority. The inquiry, after all, is whether a person purporting to wield official power has exceeded internationally recognized standards of civilized conduct, not whether statehood in all its formal aspects exists." Kadic, 70 F.3d at 245.

. In deciding this motion, Judge Sprizzo should also consider applying the pleading standard enunciated in Bell Atlantic Corp. v. Twombly, -U.S.-, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The standard seems particularly appropriate to the class actions in this case, which are intended to coerce a settlement rather than provide the framework for a trial which we all know will never take place.

. The citation is to the United Nations War Crimes Commission summary of the case based on the indictment, the evidence and arguments of counsel. See Foreword 1 Law Reports of Trials of War Criminals, at x. The General Military Government Court of the United States Zone itself reached a guilty verdict without any opinion.